| | |
|---|---|
| PULTE HOME COMPANY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LS FRAMING, INC., IBP ASSET, LLC d/b/a B-Organized Insurance, LLC, EVANSTON INSURANCE COMPANY, and OLD REPUBLIC INSURANCE COMPANY,<br><br>Defendants. | **COMPLAINT**<br><br>**(Jury Trial Demanded)** |

**COMES NOW** plaintiff PULTE HOME COMPANY, LLC ("Pulte") by and through its undersigned counsel and pursuant to the provisions of N.C. GEN. STAT. § 1-253 *et. seq.* and N.C. R. CIV. P. 57 sues the defendants named herein, and alleges as follows:

1. Plaintiff, Pulte is a Michigan limited liability company registered with the North Carolina Secretary of State and is authorized to conduct business in Mecklenburg County, North Carolina.

2. Upon information and belief, Defendant LS FRAMING, INC. ("LS Framing") is a North Carolina corporation with its corporate headquarters located in Charlotte, North

Carolina which conducted business, in whole or in part and at all times relevant hereto, in Mecklenburg County, North Carolina.

3.     Upon information and belief, IBP ASSET, LLC d/b/a B-Organized Insurance, LLC ("B-Organized") is Delaware limited liability company with its corporate headquarters located in Columbus, Ohio which conducted business in whole or in part, at all times relevant hereto in Mecklenburg County, North Carolina.

4.     The parties identified in ¶¶ 2 through 3 above are hereinafter collectively referred to as the "Subcontractors."

5.     Upon information and belief, EVANSTON INSURANCE COMPANY ("Evanston") is an insurance company and/or corporation organized or existing under the laws of the state of Illinois. Upon information and belief, at all times relevant hereto, Defendant Evanston was authorized to and doing business in Mecklenburg County and the State of North Carolina.

6.     Upon information and belief, OLD REPUBLIC INSURANCE COMPANY ("ORIC") is an insurance company and/or corporation organized or existing under the laws of the state of Pennsylvania. Upon information and belief, at all times relevant hereto, Defendant ORIC was authorized to and doing business in Mecklenburg County and the State of North Carolina.

7.     The parties identified in ¶¶ 5 through 6 above are hereinafter collectively referred to as the "Insurers."

## JURISDICTION & VENUE

8.     The Court has jurisdiction over the subject matter of this action and the parties to this action pursuant to N.C. GEN. STAT. § 7A-243.

2

9. Venue is proper in Mecklenburg Country pursuant to N.C. GEN. STAT. § 1-82 because the facts giving rise to the claims in this case arose in Mecklenburg County and, at all times relevant hereto, the defendants engaged in substantial business activities Mecklenburg County.

10. Pulte has retained the firm of BOYLE, LEONARD & ANDERSON, P.A., to represent it in this action and is obligated to pay it reasonable attorneys' fees. Pulte clams its attorneys' fees, legal assistant fees, and costs pursuant to North Carolina law applicable to this litigation.

## UNDERLYING FACTS

11. Pulte acted as the general contractor for the Central Point Townhome Development located in Mecklenburg County, North Carolina (the "Project").

12. In order to facilitate the construction of portions of the Project, Pulte entered into subcontract agreements with the Subcontractors to perform services or work and/or supply materials for the Project, as more fully detailed below.

13. Each of the Subcontractors entered into subcontracts with Pulte to perform the work and/or provide labor and/or services at the Project, detailed infra (hereinafter collectively, the "Subcontracts").

14. The Subcontractors performed their work at, and/or provided labor, material, and services for, the Project pursuant to the Subcontracts.

15. LS Framing's work, services, and/or materials provided to and for the development and construction of the Project and the residence therein include, but are not limited to, framing services.

16. B-Organized's work, services, and/or materials provided to and for the

3

development and construction of the Project and the residence therein include but are not limited to the supplying and installation of insulation.

17.     The Subcontractors were responsible for performing the specific work identified in ¶¶ 15 to 16, *supra*, at the Project.

## SUBCONTRACTS

18.     As to the Project, each of the Subcontractors entered into the Subcontracts with Pulte to perform the work identified *infra.*

19.     Each of the Subcontracts contained requirements that the respective Subcontractors procure insurance coverage specifically naming Pulte as an additional insured, or otherwise providing coverage to Pulte as an additional insured via a blanket additional insured endorsement.

20.     Available copies of the relevant Subcontracts are attached hereto:

   a.   A copy of the Subcontract(s) between Pulte and LS Framing is attached hereto as **Exhibit "A."**

   b.   A copy of the Subcontract(s) between Pulte and B-Organized is attached hereto as **Exhibit "B."**

## INSURANCE POLICIES

21.     Upon information and belief, Evanston issued a commercial general liability policy to LS Framing bearing Policy Number 3A357167 with effective dates of September 14, 2019 through September 14, 2020 ("Evanston Policy"). A copy of the Evanston Policy has been requested but has not yet been received. A certificate of insurance ("COI") identifying the Evanston Policy is attached hereto as **Exhibit "C."** Pulte reserves its right to supplement **Ex. C**

with a copy of the Evanston Policy when it is received.

22. Upon information and belief, ORIC issued a commercial general liability policy to B-Organized bearing Policy Number MWZY 31425319 with effective dates of October 1, 2019 through October 1, 2020 ("ORIC Policy"). A copy of the ORIC Policy has been requested but has not yet been provided. A COI identifying the ORIC Policy is attached hereto as **Exhibit "D."** Pulte reserves its right to supplement **Ex. D** with a copy of the ORIC Policy when it is received.

23. The policies described in ¶¶ 21 and 22, *supra*, shall collectively be referred to as the "Policies."

24. Upon information and belief, Pulte is either specifically named or otherwise qualifies as an additional insured on each of the Policies.

25. To the extent the undersigned is currently in possession of complete and/or certified copies of the above referenced Policies, the same will be filed herewith, and are specifically incorporated herein by reference.

26. To the extent there are Policies referenced herein that Pulte is not in possession of, Pulte has requested said Policies informally but has not yet received a copy of the same. However, Pulte anticipates receiving full, certified copies of those policies during discovery in this matter and will be filed separately in the court records, to the extent necessary.

## UNDERLYING ACTION

27. Nathaniel Tesh ("Tesh"), a worker on the Project, was allegedly injured on the Project as a direct result of the work performed by the Subcontractors at the Project ("Tesh Claims").

28. Pulte was named as a defendant in an action filed by Tesh, captioned *Nathan Tesh*

5

*v. Pulte Home Company, LLC et al.*, 21-CVS-11962, that directly alleges that the injuries allegedly suffered were the direct result of the work performed by the Subcontractors at the Project ("*Tesh Lawsuit*").

29.     Pulte has demanded that the Insurers defend and indemnify Pulte with respect to the *Tesh* Lawsuit pursuant to the terms of both the Policies and the Subcontracts.  To date, the Insurers have refused to do so.  Copies of denial letters sent by the Insurers are attached hereto as **Exhibit "E."**

30.     As a result of the *Tesh* Lawsuit, Pulte has been forced to defend itself against the Tesh Claims, including, but not limited to, investigating the claims, retaining counsel and experts, and incurring substantial defense fees and costs.

31.     Pulte has also suffered, and continues to suffer, additional damages in the form of lost revenue, lost personnel time, and legal costs as a direct and proximate result of the Subcontractors' acts, omissions, breaches, and violations of duties.  These additional damages constitute damages for which the Subcontractors are responsible.

## COUNT I – DECLARATORY RELIEF
## (AS TO ALL DEFENDANTS)

32.     Pulte re-alleges and incorporates the allegations contained in the preceding paragraphs as if such allegations had been fully set forth herein.

33.     Pulte is in doubt as to its rights, duties, and obligations owed pursuant to the Policies and the applicability of those particular Policies to the *Tesh* Lawsuit, including but not limited to: i) Pulte's status as an additional insured under the Policies; ii) the obligations due and owing to Pulte as an additional insured; iii) whether each Subcontractor, as the named insured, has coverage for the *Tesh* Lawsuit under their respective Policies; and iv) whether the damages

6

sustained by Tesh constitute a covered loss under the Policies. Thus, Pulte is in need of, and entitled to, a judicial declaration of its rights regarding the same.

34.     More specifically, Pulte believes coverage is available under one or more of the Policies because the damages claimed against and incurred by Pulte:

        a.   Constitute an "occurrence" under the Policies;

        b.   Meet the definition of "Bodily Injury" under the Policies;

        c.   Said bodily injury occurred as the result of the errors and omissions of the Subcontractors;

        d.   Are covered under the Policies; and

        e.   Triggered a duty under the Policies to defend Pulte.

35.     Pulte and/or the Subcontractors have complied with all conditions precedent to the filing of this lawsuit, and notwithstanding the same, the Insurers have denied the claims in question, and/or have reserved their rights to deny the claims in question. Alternatively, to the extent that Pulte and/or the Subcontractors have failed to comply with any conditions precedent, the failure to comply with the same did not prejudice and/or is immaterial as an immaterial breach of the subject contracts of insurance, as said claims were or would have been denied by the Insurers. Alternatively, the Insurers waived any such conditions and/or are estopped from asserting any defenses related to conditions precedent. More specifically, Pulte and/or the Subcontractors have plainly given notice of all claims which are the subject of this lawsuit to the Insurers and/or their designated agents.

36.     Pulte has been required to retain the undersigned and is obligated to pay them a reasonable fee for their services.

37.     Pulte, as an additional insured under the various commercial general liability and/or umbrella and/or excess policies of insurance, is entitled to the recovery of its costs and attorneys' fees in the present declaratory judgment action in the manner set forth and as provided by North Carolina law.

38.     All parties having any interest in the declarations sought and all other persons having interest therein or adversely affected are joined in this action.

**WHEREFORE,** Pulte respectfully requests that this Honorable Court declare the rights of the parties as follows:

a.  That this Court has jurisdiction over the respective parties;

b.  That this Court has jurisdiction over the subject matter;

c.  That each Insurer owed or owes a duty to defend Pulte as an additional insured under each of the Policies as applicable to each of their named insureds, the Subcontractors, from any and all of the claims referenced above in the *Tesh* Lawsuit;

d.  That the Policies were in full force and effect at all times relevant to the claims asserted by Pulte against the Subcontractors;

e.  That any and/or all of the damages referenced above against Pulte in the *Tesh* Lawsuit represent covered losses under the Policies.

f.  That no exclusions or other limitations of coverage contained in the Policies are applicable to the claims against Pulte in the *Tesh* Lawsuit;

g.  That Pulte is an additional insured under the Policies by operation of an additional insured endorsement specifically naming Pulte, or a Blanket Additional Insured Endorsement;

8

h. That Pulte is entitled to damages in the amount of the covered damages awarded against Pulte and/or paid by Pulte in the *Tesh* Lawsuit;

i. That Pulte is entitled to recovery of its defense attorneys' fees and costs that Pulte expended in its defense of *Tesh* Lawsuit;

j. That Pulte was, and still is, entitled to select its defense counsel in the *Tesh* Lawsuit;

k. That Pulte is entitled to indemnity for the *Tesh* Lawsuit;

l. Awarding Pulte pre-judgment interest;

m. Awarding Pulte post-judgment interest; and

n. Any and all such other and further relief as this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT
## (AS TO INSURERS)

39. Pulte re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

40. Pulte demanded that the Insurers for the Subcontractors defend and indemnify it for the damages, fees, costs, and expenses referenced above in the *Tesh* Lawsuit pursuant to the Policies.

41. The Insurers for the Subcontractors failed to respond to Pulte's tender as an additional insured; or alternatively, failed to and/or refused to indemnify Pulte as an additional insured under the Policies. As a result, said Insurers have breached their obligations to Pulte as an additional insured.

42. Said breach by the Insurers has resulted in damage to Pulte in the form of defense fees and costs, including, but not limited to, expert costs.

9

43.     Pulte has complied with all conditions precedent to the filing of this suit; but not withstanding the same, to the extent that there has been some failure to comply with conditions precedent, the failure of Pulte to comply with said conditions neither prejudiced nor represented a material breach of the subject contracts.  Alternatively, the Insurers waived any such conditions and/or are estopped from asserting any defenses related to conditions precedent.

**WHEREFORE,** Pulte requests this Honorable Court enter judgment against the Insurers, for damages, including pre-and post-judgment interest, taxable costs, taxation of attorneys' fees, as a result of prosecuting this action, along with any and all other relief this Honorable Court deems just and proper.

## COUNT III – VIOLATION OF N.C. GEN. STAT. § 75-1.1
## (AS TO INSURERS)

44.     Pulte re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

45.     The Insurers owed a duty to fully and properly investigate Pulte's claim and to defend and indemnify Pulte from the claims in the *Tesh* Lawsuit under their Policies.

46.     The Insurers owed a duty of good faith and fair dealing not only in the payment of Pulte's claim arising out of the insurance contract but also in the manner in which it was processed and handled.

47.     The Insurers breached N.C. GEN. STAT. § 75-1.1 by also breaching the duty of good faith and fair dealing, duty to defend, and duty to indemnify its insured, Pulte, by failing to defend Pulte and failing to respond to Pulte's tenders for defense and indemnity in the *Tesh* Lawsuit.

10

48.     More specifically, N.C. GEN. STAT. § 75-1.1 precludes unfair methods of competition in or affecting commerce, and unfair or deceptive practices in or affecting commerce.

49.     N.C. GEN. STAT. § 58-63-15(11)(a)-(n)) and/or otherwise prohibits conduct of the Insurers in this instance including but not limited to failing to timely respond to Pulte's tenders, conducting an insufficient investigation of Pulte's claim for a defense and indemnity, failing to timely defend Pulte, continuing to attempt to avoid coverage under the Policies despite clear liability for defense fees and costs, misrepresenting the extent of coverage available under the Policies, failing to reimburse defense fees and costs incurred by Pulte, failing to tender unconflicted and independent counsel, and/or other acts and/or omissions.

50.     The Insurers' refusals to properly investigate, defend, indemnify, negotiate, and participate in the *Tesh* Lawsuit on Pulte's behalf, or to take any actions to protect the interests of Pulte, constitutes bad faith and a violation of N.C. GEN. STAT. § 75-1.1 and proximately damaged Pulte. Said conduct by the Insurers entitles Pulte to an award of actual, consequential, and punitive damages, together with an award of attorneys' fees incurred in order to investigate, defend, indemnify, and resolve the *Tesh* Lawsuit on Pulte's behalf and/or other damages required by statute.

**WHEREFORE,** Pulte respectfully requests this Honorable Court enter a judgment in favor of Pulte and against the Insurers finding that the Insurers breached their duty of good faith to Pulte in failing to honor their defense and indemnity obligations due and owing to Pulte as an additional insured.

11

## DEMAND FOR JURY TRIAL

Plaintiff, Pulte, hereby demands trial by jury as to all claims and issues for which a right to jury trial exists.

BOYLE, LEONARD, & ANDERSON, P.A.

Thomas E. Shepard
N.C. State Bar No. 51204
9111 West College Pointe Drive
Fort Myers, FL 33919
Telephone:  (239) 337-1303
Facsimile:  (239) 337-7674
E-mail: tshepard@insurance-counsel.com
E-mail: eservice@insurance-counsel.com
*Attorneys for Plaintiff*

Dated: 2/2/2023

DocuSign Envelope ID: B049336E-5EAB-4414-B41C-76FA5AA59A59

## EXHIBIT A

## Master Trade Contractor Agreement

| Effective Date: 10/23/2019 | | | |
|---|---|---|---|
| Company | Full Legal Company Name: **Pulte Home Company, LLC** | | |
| | Division(s): **Charlotte** | | |
| | Address: **11121 Carmel Commons Blvd Ste 450** | | Phone: **704-414-7055** |
| | City: **Charlotte** | | General Contractor License No.: 19311 |
| | State: **NC** | Zip: **28226** | Email of Company Contact: **Joe.Kirby@PulteGroup.com** |
| | Authorized Representative: **Joe Kirby** | | Cell Phone: **980-722-2981** |
| Contractor | Full Legal Company Name: Omar Luis Santos | | |
| | Vendor Number (if assigned by Pulte): 461LSF100 | | |
| | Contractor License No.: N/A | | |
| | Employer I.D. No.: N/A | | |
| | Address: PO BOX 43207 | | Phone: 704 222-1520 |
| | City: Charlotte | | |
| | State: NC | Zip: 28215 | Email of Contractor Contact: santoscompany21@yahoo.c |
| | Authorized Representative: N/A | | Cell Phone: N/A |
| Premier (lien agent) | Premier Land Title Company | | |
| | Address: c/o LiensNC, 19 W. Hargett Street, Suite 507 | | |
| | City: Raleigh | | Phone: (888) 690-7384 |
| | State: North Carolina | Zip: 27601 | Fax: (919) 489-5231 |
| | Website: www.liensnc.com | | |

THIS MASTER TRADE CONTRACTOR AGREEMENT (**"MTCA"**) is by and between Company and its Affiliates engaged in residential homebuilding activities in the Division's market area (collectively, **"Pulte"**) and Contractor, and is effective on the date set forth above.

## 1.   DEFINITIONS

"**Affiliate**" means any person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with a party. As used in this definition "control" (including, with correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interest, by contract or otherwise).

"**Agreement**" means: (a) this MTCA; (b) Work Orders; (c) exhibits to this MTCA; and (d) any amendments to this Agreement.

"**Applicable Laws**" means all applicable local, state and federal ordinances, laws, rules and regulations, including building codes, safety laws, FHA/VA requirements, occupational safety and health standards promulgated by the Secretary of Labor under OSHA, the Fair Labor Standards Act, the Immigration Reform and Control Act of 1986, any other federal

1 of 23

Nc Master Trade Agreement

or state labor or employment law, and environmental and natural resource laws, rules and regulations, including ordinances and policies.

"**Authorized Representative**" means the individual designated by each party to be principal point of accountability for coordinating and managing that party's obligations under this Agreement.

"**Change**" means a modification, alteration or deviation in the Work, or additional services not described in the applicable Work Order.

"**Claim**" or "**Claims**" means any and all claims (including personal injury, bodily injury, death or property damage), demands, suits, actions, proceedings, citations, fines, penalties, obligations, damages, losses, liabilities, liens, awards, judgments, costs or expenses (including attorneys' fees and costs, expert witness fees and costs and other expenses of any litigation, mediation, arbitration, judicial reference or other legal proceeding of any kind incurred as a result of such claims or in enforcing the indemnity obligations set forth in this Agreement), of every kind or nature, whether based on tort, contract, or equitable principles.

"**Construction Schedule**" means the schedule for a Project, including the Work to be performed by Contractor, that is prepared by Pulte and provided to Contractor.

"**Contractor's Agents**" means suppliers, subcontractors, laborers, materialmen, engineers, agents, consultants and other persons from which Contractor purchases or contracts for labor and Materials required to perform the Work and any other entity or person under the direction of Contractor.

"**Costs**" means all direct and indirect costs, fees, damages, fines, penalties, and all other expenses incurred or paid by Pulte in connection with the Work or this Agreement, including costs of Materials, labor costs, equipment costs, production stoppage costs, and legal fees and expenses.

"**Force Majeure Event**" shall mean any delay caused by any condition beyond the reasonable control of either Pulte or Contractor, such as an act of God; fire or other casualty; delay caused by any governmental authority unrelated to any act of failure to act by either Pulte or Contractor; any act of terrorism or sabotage; and/or a civil riot. Any strike or other labor difficulties shall not be considered a Force Majeure Event for the purposes of this Agreement if such labor difficulties are caused by the action or inaction of Contractor.

"**Indemnitees**" means Pulte and its members, managers, shareholders, subsidiaries and Affiliates, and the officers, directors, shareholders, insurers, representatives, agents, employees, successors and assigns of all such parties.

"**Liens**" shall refer to any and all mechanics' liens, materialmens' liens, construction liens, stop notice or bond claims or any attachments, levies, garnishments, or suits.

"**Materials**" means any and all materials and supplies included with or used in connection with Work which may be designated by Pulte in the Specifications for a Project.

"**NPDES Permit(s)**" means a permit obtained by Pulte under the National Pollutant Discharge Elimination System ("**NPDES**") for a Project.

"**Project**" means a Pulte community or building project or any other project designated by Pulte.

"**Specifications**" means all plans, reports, drawings, sketches, renderings, specifications, option lists and other related documents in connection with any Project, including specific trade scopes of work, Take-off, job-site specifications, Pulte Construction Standards, working drawings and all revisions thereto made throughout the progress of the Project.

"**Stormwater Applicable Laws**" means the Federal Water Pollution Control Act of 1972, as amended, and all federal, state and local laws, rules, regulations, ordinances, and policies relating to stormwater pollutants, sedimentation control and erosion control.

Case 3:23-cv-00177-KDB-DCK   Document 1-2   Filed 03/24/23   Page 14 of 80

"**SWPPP**" means an erosion, sedimentation, and stormwater pollution prevention plan prepared by Pulte for a Project to comply with the NPDES, and other requirements, in order to control pollutant, erosion, sediment, and stormwater discharges and to prevent certain non-stormwater discharges.

"**Take-off**" means a detailed list of Materials with quantities and units of measure that are required to perform the Work on a Project.

"**Warranty Period**" shall be the period of time beginning on the date of Contractor's commencement of the Work and continuing until the later to expire of: (a) the applicable home warranty period provided to customers of Pulte, as posted at www.pulte.com; or (b) any express, implied or other warranty for the Work or Materials required by Applicable Laws.

"**Waste**" means waste material, spoils, dirt, mud, scrap, debris, trash, excess Materials and rubbish.

"**Work**" means the construction and services required by or reasonably inferred from this Agreement, whether completed or partially completed, and includes all other labor and Materials provided or to be provided by Contractor to fulfill Contractor's obligations. The Work may constitute the whole or a part of a Project. Touchup work, punch list work and minor patching are considered a part of the Work.

"**Work Orders**" include any combination of: (a) a purchase order, release, Schedule A or other request for Work and any Changes; (b) job initiation order or notice to proceed; (c) Specifications; and (d) the Construction Schedule. Work Orders may be in written or electronic format, and may be provided by or through any media, platform or mode of communication selected by Pulte.

"**Work Price**" means the agreed upon price for Work set forth in the applicable Work Order. If Pulte has an agreement for direct pricing with a manufacturer or supplier of Materials, prices for such Materials shall in no event exceed any prices agreed to between Pulte and the applicable Material manufacturer or supplier. Contractor agrees that any price reduction applicable to Materials subsequent to the Work Order date, but prior to delivery, shall be applicable to the Work Price.

## 2. BACKGROUND

2.1 **Purpose**. Pulte and Contractor desire to enter into a business relationship covering Contractor's provision of Work in connection with Projects. This MTCA sets forth the terms under which Pulte may request and Contractor shall provide Work.

2.2 **Term of Agreement**. This Agreement shall be effective on the Effective Date and continue for an initial term of 2 years, unless earlier terminated in accordance with its terms. This Agreement shall automatically renew on the same terms for consecutive 1 year terms unless either party provides written notice of its intent not to renew this Agreement, not less than 90 days prior to the expiration of the initial term or then-current term. In the event that Contractor elects not to renew this Agreement, Contractor nevertheless shall complete all outstanding Work Orders in accordance with the terms of this Agreement and the relevant Work Orders.

2.3 **Order of Precedence**. The provisions of the documents comprising the Agreement shall, to the extent possible, be interpreted consistently, and in a manner so as to avoid conflict. In the event of a conflict or inconsistency, the following order of precedence shall apply: (i) any amendments to this MTCA; (ii) the terms of this MTCA; (iii) exhibits to this MTCA; (iv) the applicable Work Order.

2.4 **Conflicts and Inconsistency with Other Documents**. Any and all terms on any other agreements, contracts, proposals, bids, acknowledgements, invoices or other documentation are void to the extent of any conflict and/or inconsistency with this Agreement.

## 3. ORDERING PROCESS

3.1 **Specifications**. During the term of this Agreement, Pulte may make available Specifications and related documents and information to Contractor related to a specific Project, and ask Contractor for a bid or proposal for Work. If requested by Pulte, Contractor may, at no cost to Pulte, work on the initial development of the Specifications for a specific Project, provided that such assistance by Contractor shall not entitle Contractor to any Work Orders.

3.2     **Jobsite Inspection**. In connection with Contractor's bid or proposal for Work, Contractor shall: (a) inspect the applicable Project jobsite, if necessary, available and accessible, and review the Specifications for the Project in formulating and preparing its bid or proposal; (b) identify all proposed Contractor's Agents; (c) provide all information requested by Pulte, including detailed take-offs, specifications and literature for Materials, quantities, unit costs, labor costs and hours, submittals, shop drawings, insurance costs and other overhead; and (d) investigate and confirm that its proposed Work complies with all Applicable Laws and immediately notify Pulte in writing of any portion of the Work that does not so comply.

3.3     **Ownership**. Contractor agrees that all Specifications, including copies thereof, are the property of Pulte and are not to be used on other work or given to other parties, except as required for the Work. Pulte shall be deemed the author and owner of the Specifications and shall retain all common law, statutory and other reserved rights, including copyright. All Specifications and all copies thereof shall be returned to Pulte upon completion of the Work.

3.4     **Work Orders**. During the term of this Agreement, Pulte may issue Work Orders to Contractor for Work. Items of Work omitted from Work Orders or Specifications that are clearly inferable from the information presented therein shall be provided and performed by Contractor, and shall be deemed to be part of the Work, at no additional cost to Pulte. Contractor shall immediately notify Pulte of any discrepancy, error, conflict or omission discovered by Contractor in the Work Orders or Specifications at any time.

3.5     **Changes to Work Orders**. If Pulte requests a Change that increases the cost of the Work, Contractor shall provide to Pulte, within a reasonable time, not to exceed 3 business days, a written report stating the estimated cost of such Change and estimated time to incorporate the Change into the Work and the impact upon the Work Price. Any mutually agreed Change that increases the Work Price for the applicable Work Order shall be set forth in writing as an amendment to the applicable Work Order. Any such Change shall contain a detailed description of the additional Work, a completion date and the amount(s) and schedule of payment of the Work Price authorized for such Change. Pulte shall have the right to request a Change that does not increase the cost of the Work. Pulte shall have the right to delete any portion of the Work described in a Work Order by giving at least 1 business day written notice to Contractor. The Work Price will be reduced by an amount equal to the price of the deleted Work determined by applying the same cost structure for Materials, labor, overhead and profit utilized in calculating the original Work Price.

3.6     **No Guarantee of Work**. This is a non-exclusive agreement and nothing herein constitutes a promise, guarantee, representation or commitment of any minimum or specified number of opportunities or that any Work Orders will be issued to Contractor. Contractor is not obligated to accept any Work Orders from Pulte, and Contractor shall accept or decline any Work Order, in writing, within 2 business days after issuance of the proposed Work Order by Pulte.

## 4.     INITIATION OF WORK

4.1     **Notice to Proceed**. Unless the Work Order specifies otherwise, Contractor shall have no authority to commence Work at any location of the Project until Contractor has received notice to proceed from Pulte.

4.2     **Permits**. Contractor shall, at its sole cost, obtain all permits required for Contractor to perform the Work, other than general building permits, which shall be provided by Pulte.

4.3     **Licensing**. Contractor must be properly authorized to do business in every jurisdiction where it shall perform the Work, and properly licensed to perform the Work by all necessary governmental authorities. Contractor shall maintain current copies of all licenses and certificates of competency required by all jurisdictions where Contractor shall perform Work and provide current copies of these documents to Pulte within 2 business days of request by Pulte.

4.4     **Jobsite Inspection**. Contractor, prior to commencing Work on the Project, or at any subsequent time as reasonably necessary, shall:

(a)     inspect the then-current state of the Project jobsite and review the latest version of the Specifications and Construction Schedules for the Project;

(b)     ascertain the jobsite conditions to be encountered in the performance of the Work;

(c)    report any discovered damage to Pulte;

(d)    verify that all Work, storage and access areas and surfaces related to or adjoining the Work are satisfactory for the commencement of the Work; and

(e)    notify Pulte of any discrepancy, error, conflict or omission discovered by Contractor regarding the Project, Specifications or Work Order.

4.5    **Acceptance of Jobsite**. The commencement of the Work by Contractor shall be deemed as Contractor's acceptance of the jobsite and all access and storage areas.

## 5.    PERFORMANCE AND PROGRESS OF WORK

5.1    **Performance of Work**. Contractor shall perform all Work described in the applicable Work Order in accordance with this Agreement.

5.2    **Instructions to Contractor**. From time to time Pulte may issue instructions to Contractor identifying the Work to be performed at each specific location within the Project, and establishing a Construction Schedule for that portion of the Work. Pulte may also direct that certain parts of the Work be prosecuted in preference to others in order to maintain the progress of the Project.

5.3    **Review**. Contractor shall stay informed regarding all changes in the jobsite, Specifications and Construction Schedules throughout the course of the Project. Contractor shall review the Construction Schedule daily to verify, prior to commencing any Work, any Changes and that the Materials, colors, options, elevations and orientation of the garage on the lot are correct.

5.4    **Costs of the Work**. Contractor shall furnish, at its own cost and expense, all labor, Materials, tools, equipment, facilities, scaffolding, light, appliances, fans, and any water pumping necessary to perform the Work. To the extent not otherwise provided, Contractor shall also furnish at its own cost and expense, electricity and heat necessary to perform the Work. Contractor shall pay all taxes, royalties and license fees applicable to such items furnished by Contractor and forms and methods used by Contractor in the performance of this Agreement. Contractor shall secure and pay for all government approvals necessary for the use of such items. If Contractor uses Pulte's equipment or facilities, then Contractor shall reimburse Pulte, at a pre-determined rate prior to use thereof.

5.5    **Personnel**. Contractor shall have the necessary personnel available to meet the Construction Schedule and to compensate for weather delays.

5.6    **Project Meetings**. Contractor shall attend all Project meetings called by Pulte.

5.7    **Project Manager**. At all times when the Work is in progress, Contractor shall have a qualified, experienced and knowledgeable project manager, superintendent or foreperson, readily available or on the Project jobsite as Contractor's representative for the Project who is able to communicate in English with Pulte and others on the jobsite and is authorized to represent Contractor as to all matters on the Project and to make such monetary and non-monetary decisions on behalf of Contractor as may be necessary for the prompt and efficient performance of this Agreement. Prior to the commencement of Work, Contractor shall notify Pulte of the identity of Contractor's representative on the Project jobsite and any replacement representative. Pulte may reasonably reject Contractor's representative and any replacements.

5.8    **Conduct**. While at any Pulte facility or a Project jobsite, Contractor, Contractor's employees and Contractor's Agents shall conduct themselves in a professional manner, shall comply with all Project jobsite rules and regulations adopted by Pulte, and shall comply with all of Pulte's reasonable requests regarding personal conduct.

5.9    **Project Rules and Applicable Laws**. In connection with all of its activities under this Agreement, Contractor shall comply with all rules, programs and processes initiated by Pulte for the Project and all Applicable Laws.

5.10    **OSHA Compliance**. Contractor acknowledges that the Occupational Safety and Health Act of 1970 (and any and all state and local laws related to occupational health and safety) (the **"OSHA Regulations"**), all as amended from time to time, require, among other things, all contractors and subcontractors to furnish to their workers employment and a

Nc Master Trade Agreement

place of employment that is free from recognized hazards. In this regard, Contractor specifically agrees, without limitation of its general obligations under Section 5.9, as follows:

(a) Contractor will fully comply with the OSHA Regulations then in effect during the performance of any Work and will cooperate with Pulte and all subcontractors of Pulte in order to assure compliance with the OSHA Regulations.

(b) Contractor accepts full responsibility and liability for the training of its employees as to all precautionary measures necessary to protect such employees during both routine and emergency situations on the Project jobsite and Contractor shall make available for Pulte's review all records and logs indicating such training was administered by Contractor to its employees.

(c) Contractor will assist Pulte in complying with the OSHA Regulations.

(d) Before using any chemicals in its performance of the Work for Pulte or incorporating any chemicals into Materials supplied to Pulte or to the Project jobsite, Contractor must give Pulte prior written notice of the existence and the possible exposure to such chemicals, and deliver a material safety data sheet to Pulte.

(e) Contractor will fully comply (and will cause its employees and Contractor's Agents to comply) with all Project jobsite rules or regulations, including those that relate to safety, that Pulte may put in place. Even though Pulte may put some safety-related rules and regulations in place, Contractor acknowledges that it continues to be responsible for the safety of its employees and Contractor's Agents and that Pulte assumes no responsibility or obligation for their safety.

5.11 **OSHA Violations**. Pulte has entered into this Agreement with Contractor with the expectation that Contractor will perform Work on the Project jobsites fully in compliance with OSHA Regulations. Any failure by Contractor to do so could result in potential losses to Pulte (potential liability for injuries, administrative fines or penalties, operational costs due to work stoppages, etc.). Because of these potential losses, if Pulte identifies violations of OSHA Regulations or of the Project jobsite rules and regulations related to safety by Contractor (or its employees or Contractor's Agents), Contractor shall, in addition to and not in place of any and all other rights and remedies that Pulte may have under this Agreement, reimburse Pulte for all Costs. Pulte may offset or back-charge these Costs against amounts that may otherwise be due from Pulte to Contractor under this Agreement. Although Pulte has the right to do so, Pulte has no obligation to monitor compliance with OSHA Regulations by Contractor (and its employees and Contractor's Agents). Pulte's failure to assess Costs against Contractor as provided in this Section 5.11 shall in no way waive any of Pulte's rights and remedies available under this Agreement or otherwise. Furthermore, failure to comply with this Section is a default by Contractor, giving Pulte the right to exercise any remedies (including termination, penalties and fines) available under this Agreement.

5.12 **Injuries**. Contractor shall immediately advise Pulte of any injury to any of Contractor's employees or Contractor's Agents at the jobsite, and will provide Pulte with a written report regarding such injury within 24 hours of such injury.

5.13 **Clean Jobsite**. Contractor shall at all times keep all aspects of the Project jobsite, including any streets, alleys, sidewalks and storage areas, free from all Waste generated in connection with the Work, and remove all such Waste from the jobsite or deposit it in such locations as Pulte may from time to time designate. When practicable, all such Waste shall be compacted before disposal. The interior and exterior of all homes on a Project are to be clean at all times to allow Contractor and all other contractors and subcontractors of Pulte to perform their work efficiently and safe. Upon completion of the Work, Contractor shall promptly remove all such Waste and tools from the Project jobsite. Contractor shall leave the Project jobsite and adjacent areas thereto in "broom clean" condition at the end of each day. Contractor shall also move all excess usable Materials and/or spoils provided to Pulte by Contractor in accordance with instructions issued by Pulte. If Contractor fails to clean up as provided herein, Pulte has the right, but not the obligation, to do so and Pulte shall be entitled to reimbursement from Contractor for all Costs of such clean up. If a dispute arises among Contractor, other contractors and Pulte as to the responsibility for maintaining the Project jobsite and the surrounding area free from Waste, Pulte may clean up and Pulte will allocate the Costs among those responsible, as reasonably determined by Pulte. Pulte's allocation of Costs shall be binding on Contractor.

5.14    **Noise**. Contractor shall comply with all requirements of the local jurisdiction within which a Project is located relating to construction noise.

5.15    **Work Hours**. Unless otherwise specified by Pulte, construction, alteration, or repair activities which are authorized by a valid permit shall be allowed only during the hours permitted by the local jurisdiction in which the Project is located. On weekends and federal holidays, construction shall be allowed only as permitted by the local jurisdiction and any active homeowners' association rules.

5.16    **Blasting**. If blasting activities are required for the Work, Contractor shall conduct the blasting activities in compliance with all Applicable Laws. Contractor shall submit blasting plans for review and approval by the local jurisdiction prior to commencing any blasting activities.

5.17    **Excavation or Digging**. Contractor must verify that there is no conflict with the location of any utilities or landscaping prior to any excavation or digging. Contractor shall have all existing underground utilities located prior to excavation or digging. Contractor shall perform the Work so as to not damage utility lines, and shall follow all applicable encroachment standards affecting the utility rights of way and adequately protect its own employees, and those of others and Pulte, in performing the Work.

5.18    **Use of Utilities**. Contractor shall not use any utilities, except those specifically provided by Pulte. Current homeowners' utilities shall not be used except where approved by homeowner for the purpose of completing warranty work.

5.19    **Coordination of Work**. Contractor shall coordinate its Work with Pulte and other contractors and subcontractors of Pulte so that Contractor's performance of its Work will not interfere with or cause problems, defects or delays in the work being performed by Pulte and its other contractors and subcontractors.

5.20    **Failure to Prosecute the Work**. If Contractor should fail or refuse to prosecute the Work properly and diligently or fail to perform any provisions of this Agreement and should any such failure or refusal continue for 24 hours after oral or written notice to Contractor, then such failure shall constitute a breach of this Agreement. Such breach shall entitle Pulte to immediately terminate this Agreement or the applicable Work Order, and remedy the situation with all Costs being borne by Contractor.

5.21    **No Damages for Delays**. Pulte shall have no liability to Contractor if any other contractor fails to comply with its respective Construction Schedule thereby delaying the progress of the Work. Contractor expressly agrees not to make, and hereby waives, any and all monetary claims for damages against Pulte caused by any delay for any cause whatsoever, even those delays caused by Pulte or those delays for which Pulte may otherwise be liable. Contractor acknowledges that an extension of time shall be its sole and exclusive remedy in this regard. Should Contractor be delayed in the prosecution of any Work solely by the acts of Pulte or by a Force Majeure Event, the time allowed for completion of the Work shall be extended by the number of days that Contractor has been thus delayed, but no allowance or extension shall be made unless a claim therefor is presented in writing to Pulte immediately upon the onset of such delay.

5.22    **Shortage of Labor or Materials**. Contractor shall give Pulte immediate written notice if Contractor foresees, experiences or is advised of any constraint, shortage or insufficiency in the supply of any Materials, labor or other items necessary for Contractor to timely perform its obligations under this Agreement. The giving of such notice shall not excuse Contractor from its obligations hereunder. In the event of any such constraint, shortage or insufficiency, Contractor shall, at its own cost and expense, use its best efforts to promptly resolve any such constraint, shortage or insufficiency, including increasing its forces, working such overtime or expediting the delivery of Materials or other items as may be required to bring its Work into compliance with the Construction Schedule. Contractor shall provide Pulte with priority of supply and labor over any other customer of Contractor at no additional cost to Pulte. In the event that Contractor is unable to remedy a Material shortage under this Section 5.22, Pulte may, at its sole discretion, locate, order and take delivery of affected Materials directly from the manufacturer or an alternative supplier and Contractor shall reimburse Pulte for all Costs associated therewith.

5.23    **No Changes to the Work**. Contractor shall not make any changes in the Work (including additions, deletions or substitutions) or perform any additional Work without the prior written consent of Pulte. Contractor will not receive any sums in excess of the Work Price or any extension in the Construction Schedule without first obtaining such

prior written consent of Pulte. Any authorizations for changes in Work, including performance of additional Work, shall be subject to the terms of this Agreement and shall be upon such written forms as shall be provided by Pulte to Contractor.

**6.     RECEIPT AND PROTECTION OF MATERIALS; PROTECTION OF WORK**

6.1     **Take-offs**. Contractor and Pulte shall mutually agree upon Take-offs. After such mutual agreement, no adjustments in the Take-off shall be permitted without Pulte's prior express written consent. Contractor shall be responsible to obtain or procure any Materials necessary to complete the Work in excess of the quantities set forth in the Take-off at Contractor's own expense.

6.2     **Acceptance of Materials**. Contractor is responsible for accepting or rejecting all Materials. Contractor shall reject all Materials that do not conform to the Specifications. Contractor shall not install or use any damaged Materials.

6.3     **Risk of Loss**. All Materials delivered to and accepted by Contractor or transported by Contractor to and from the Project jobsite shall be at the sole risk and responsibility of Contractor.

6.4     **Protection of Materials and Work**. Contractor shall keep, store and maintain all Materials in good order and protect all Materials from damage, theft and loss. Contractor shall be solely responsible for the protection of and good condition of the Work until final completion thereof.

6.5     **Loss or Damage to Materials and Work**. Contractor shall protect the Work and all property adjacent to that upon which it is performing Work and the property, work and materials of other contractors and subcontractors from injury arising out of the Work. In no event shall Pulte be responsible for loss or damage to the Work proximately caused by the Contractor's breach of this Agreement or a Work Order, by a negligent, reckless, or intentional act of the Contractor constituting a tort under applicable statutes or common law, or by violations of any applicable statute or regulation, and Contractor shall indemnify and hold Pulte harmless from any such claims.

6.6     **Natural Disasters**. Without limiting the generality of the foregoing, Contractor shall take all precautions and actions that may be appropriate, whether or not requested by Pulte, to protect Materials and Work during predicted natural disasters, such as tornados, hurricanes, and severe thunderstorms.

6.7     **Damage, Theft, or Vandalism**. Contractor is solely responsible for its Materials, tools and equipment lost, damaged or stolen at the Project jobsite. Contractor shall be responsible for any defect in the Work or damages, theft or loss thereof caused by or resulting from its failure to adequately and properly protect the Work. Contractor shall be fully liable and responsible to Pulte for all Costs associated with any damage, loss, theft, or vandalism resulting from Contractor's failure to fully comply with the terms of this Section. Contractor acknowledges and agrees that Pulte owes no duty to protect the Work and if Pulte uses the services of any security guard that such services are for Pulte's exclusive benefit and that Contractor shall not rely upon such services.

**7.     PRICES AND PAYMENT**

7.1     **Work Price**. Contractor shall perform the Work for the Work Price.

7.2     **Payment Procedures**. Pulte shall designate the methodology for payment to Contractor.

(a)     If Contractor is instructed to submit invoices to Pulte, then Contractor will remit invoices, and Pulte will pay such invoices, in accordance with the terms of the applicable Work Order. Unless otherwise provided by Pulte in writing, then all amounts due Contractor for Work performed pursuant to this Agreement are due 30 days following the date of receipt by Pulte of Contractor's invoice. An invoice date shall be no earlier than the date the Work, or applicable portion thereof, is completed. All invoices must be submitted by Contractor within 30 days of its completion of the Work, or applicable portion thereof. Invoices received after 90 days of the completion of the Work, or applicable portion thereof, shall be null and void. Pulte shall not be liable for any charges associated with the Work represented by such delinquent invoices, and Contractor hereby expressly waives its right to receive any payment in connection with any such delinquent invoices.

DocuSign Envelope ID: B649336E-5EAB-4414-B41C-76FA5AA69A59

(b)     If Pulte manages payments to Contractor with an electronic payment system in lieu of invoices, payment to Contractor is due 30 days following sign-off from the designated Pulte Project superintendent of completed portion(s) of the Work.

7.3    **Notice of Nonpayment**. Contractor agrees to notify Pulte within 5 business days if Contractor has not received payment in full within 60 days of payment becoming due under Section (a) or (b) above. Failure to so notify all appropriate parties will result in Contractor forfeiting money due for such completed Work.

7.4    **Additional Documentation**. As a condition to any payment to be made by Pulte to Contractor, Pulte may, at its option, require Contractor to furnish to Pulte: (a) full and complete Lien waivers, in a form acceptable to Pulte, executed by Contractor and all Contractor's Agents, as well as any other information and documentation requested by Pulte, with respect to the Work covered by the applicable invoice; and (b) a current sworn statement from Contractor attesting to the identity of all Contractor's Agents, the amount of each subcontract or contract with Contractor's Agents, the amount requested for any Contractor's Agent in the applicable invoice, the amount Contractor has paid to each Contractor's Agent, and the amount to be paid Contractor under the invoice.

7.5    **No Waiver**. Payment under any Work Order is not evidence of performance of Contractor's obligations under this Agreement, either in whole or in part, and payment does not constitute acceptance of defective Work.

7.6    **Retainage**. Subject to Applicable Laws, Pulte may retain up to 10% from amounts owing to Contractor under a Work Order. Such retainage may be retained by Pulte as long as permitted by Applicable Laws. In the event that no Applicable Laws govern, Pulte may retain the retainage for such period of time during which a Lien or claim of Lien could lawfully be filed by anyone related to the applicable Work Order.

7.7    **Set-offs**. Contractor agrees that amounts owed under any Work Order are subject to offsets by Pulte in the event of: (a) Contractor's breaches of this Agreement; (b) any damages caused by Contractor; (c) any Liens, Costs or other claims arising out of the Work; (d) any Costs of curing defective Work or completing unfinished Work; (e) Contractor's breaches of other agreements between Contractor and Pulte; or (f) claims or amounts due to Pulte regardless of whether they arise out of this Agreement. If Pulte terminates any Work Order as a result of Contractor's failure to comply with the terms and conditions of the Work Order or this Agreement, then Pulte shall have the right to terminate any other agreements between Contractor and Pulte.

7.8    **Effect of Contractor's Breach**. If Contractor breaches this Agreement, Pulte may stop all payments to Contractor until such time as Pulte ascertains its Costs resulting from the breach, at which time Pulte is authorized to deduct all Costs related thereto from any monies owed Contractor.

7.9    **Disputed Payments**. Contractor shall not delay or stop any Work by reason of Pulte's failure to make any payments if the failure is a result of a dispute as to the amount of the payment or whether payment is due.

## 8.    LIENS; WAIVER OF LIENS

8.1    **No Liens**. Contractor shall pay when due, all claims for labor, equipment and Materials furnished to the Project as part of the Work, and all claims made by any benefit trust fund pursuant to any collective bargaining agreement to which Contractor may be bound, to prevent the filing of any Liens involving the Work, the Project or Contractor. Contractor shall within 5 days after notice take whatever action is necessary to terminate the effect of any Liens, including filing or recording a release or lien bond.

8.2    **Failure to Remove Liens**. Contractor's failure to comply with the requirements of Section 8.1 within a period of 5 days after notice from Pulte of any Liens shall entitle Pulte to terminate the applicable Work Order or this Agreement or both. In addition, Pulte may use whatever means it may deem best to cause the Liens, together with their effect upon the title of the Project, to be removed, discharged, compromised or dismissed, including making payment of the full amount claimed, and the Costs thereof shall become immediately due and payable by Contractor to Pulte.

8.3    **Pulte May Withhold Payment to Contractor**. If Pulte receives notice of any failure to pay or notice of Liens (or intent to Lien) pertaining to Contractor, Contractor's Agents or the Work, Pulte may withhold the payment of any

monies to which Contractor would otherwise be entitled to receive, until such time that Pulte has reasonable evidence that such Liens have been discharged.

8.4 **Direct or Joint Payments**. If Contractor fails to pay and discharge when due any monetary obligations of any kind or nature whatsoever incurred by Contractor by reason or in the fulfillment of this Agreement, whether or not Liens have been or may be issued or filed with respect thereto, which monetary obligations in the opinion of Pulte are proper, Pulte may pay all or any part of such monetary obligations for Contractor's account or Pulte may issue payment jointly to Contractor and the applicable third party. Pulte has no obligation to make any such direct or joint payment and whether it chooses to make any such payment is solely at the discretion of Pulte. Any such payment made by Pulte shall constitute a payment to Contractor under this Agreement. Contractor hereby expressly waives and releases any claim against or right of recovery from Pulte by reason of any act or omission of Pulte in making any such payment and nothing herein shall be deemed to mean Pulte assumes any liability towards Contractor's Agents.

8.5 **Payment of Costs**. Contractor shall pay to Pulte upon demand all Costs in connection with the discharge and release of any Lien.

8.6 **Waiver of Lien Rights**. Contractor intends to furnish Work in the construction, repair or replacement of improvements upon real property owned or to be owned by Pulte.

(a) Contractor shall not assign any claim for payment or any right to perfect a Lien against Work, real property, or the improvements thereon, to any third person. Any such attempted assignment shall be invalid and not enforceable and shall be deemed a breach of Contractor's obligations under this Agreement. Contractor shall include substantially identical language to this Section 8.6(a) in all subcontracts for Work.

(b) In addition to any notices required by Applicable Law, Contractor shall provide Pulte with written notice at least 10 business days before placing or filing any Lien against any real property upon which Work is performed.

**PULTE HEREBY NOTIFIES CONTRACTOR AND CONTRACTOR ACKNOWLEDGES THAT PULTE HAS DESIGNATED PREMIER AS ITS LIEN AGENT PURSUANT TO APPLICABLE LAW AND PREMIER'S CONTACT INFORMATION IS LISTED ABOVE.**

## 9. QUALITY, INSPECTION AND CORRECTION OF WORK

9.1 **Quality of the Work**. Contractor shall perform the Work in a good and workmanlike manner, free of defects, in compliance with this Agreement, Applicable Laws, and all manufacturer's recommendations, installation guidelines and specifications, and to the satisfaction of Pulte. All Work shall meet or exceed the highest standards of the industry for residential construction in the same geographic area.

9.2 **Inspection of the Work**. Contractor shall inspect the Work for quality and completion. Contractor shall schedule all inspections relative to the Work and shall perform any tests necessary to receive inspection approval. Pulte may hire third party inspectors and Contractor shall cooperate with such inspectors and make corrective Work they require, at no additional cost to Pulte.

9.3 **Correction of Deficiencies or Defects**. Contractor shall promptly correct all Work which Pulte deems deficient, defective or nonconforming. Contractor shall bear all costs of correcting such rejected Work without any increase in the Work Price. Pulte may nullify any previous approval of Work if it subsequently determines that the Work is defective or non-compliant with the Work Order. Contractor shall, within 1 business day after receiving notice from Pulte, take down all portions of the Work and remove from the grounds and buildings all Materials, which Pulte rejects as unsound or improper, and Contractor shall repair or replace all Work rejected at Contractor's sole expense.

9.4 **Pulte's Rights**. If Pulte exercises any of its options, remedies or rights under the terms of this Agreement in the event of any material failure of performance or breach by Contractor, Pulte may: (a) use any Materials on the Project jobsite, which belong to Contractor, to complete the Work, whether such Work is completed by Pulte or others, and Contractor agrees that it shall not remove such Materials from the Project jobsite unless directed in writing by Pulte to do so; (b) eject Contractor from the Project jobsite; and (c) enforce any or all of Contractor's contracts with Contractor's

Agents, true and complete copies of which (including all modifications and change orders) shall be provided by Contractor immediately upon Pulte's request. In exercising its rights under Section 9.4(c), Pulte shall only be acting as the authorized agent of Contractor and Pulte shall not incur any independent obligation in connection therewith.

## 10.  WARRANTIES; WARRANTY WORK AND PERFORMANCE STANDARDS

10.1   **Materials and Work**. Contractor warrants and guarantees that: (a) all Materials, except materials provided by Pulte, shall meet or exceed the requirements of this Agreement, all Applicable Laws and shall be new, of good quality and free of Liens, security interests, claims or encumbrances; and (b) all Work shall meet or exceed the requirements of all Applicable Laws.

10.2   **Warranty**. Contractor warrants that the Work shall be and remain free from defects or flaws for the Warranty Period. Upon Pulte's acceptance of the Work, Contractor shall deliver and transfer to Pulte any and all manufacturer's warranties for Materials. The warranties and guarantees contained herein shall in all cases survive termination of this Agreement and shall apply to both patent and latent defects in workmanship and materials.

10.3   **Warranty Work and Performance Standards**. If, during the applicable Warranty Period, the Work does not comply with the warranties set forth in this Agreement, then Contractor shall promptly repair or replace the Work at Contractor's sole cost and expense, within 48 hours after notice to do so, or within 3 hours after notice in the event of any emergency. Pulte shall determine whether an emergency exists, which generally includes those conditions involving the risk of harm to persons or property or which make the home not habitable comfortably. Repairs and replacements shall be made in a diligent first-class manner with as little inconvenience as possible to Pulte and the homeowner. Contractor shall clean up thoroughly after repairs are completed. Neither repairs nor replacements shall be deemed to be complete until the defect or non-conformity has been permanently corrected. Contractor shall reimburse Pulte (or at Pulte's direction, the homeowner) for any damages to the home, for any damages to the personal property located at the home, and for any reasonable Costs incurred as a result of the inconvenience or loss of use and enjoyment of the home which is caused by the defect, non-conformity or the repairs or replacements. If Contractor fails or refuses to timely fulfill any of its warranty obligations, Pulte may repair or replace the applicable Work and Contractor shall reimburse and pay Pulte for all Costs related thereto.

10.4   **Repairs After Expiration of the Warranty**. If the Work is determined by Pulte to be defective or otherwise non-conforming after the expiration of the Warranty Period but before the expiration of the applicable statute of limitations or repose, Contractor shall, upon request from Pulte, repair and replace such Work. Contractor shall use commercially reasonable efforts to promptly perform such repair and replacement at Contractor's sole cost and expense. If Contractor performs any such repair or replacement after the expiration of the Warranty Period and after the expiration of the applicable statute of limitations or repose, Pulte shall compensate Contractor for such repair or replacement activities at reasonable market rates. The provisions of this Section shall survive expiration or termination of this Agreement or completion of the Work.

10.5   **Notice and Opportunity to Repair Statutes**. Contractor shall cooperate with Pulte in connection with any matters relating to any applicable notice and opportunity to repair statutes. If Contractor fails or refuses to cooperate in that process, Pulte will have the right to correct any defective Work and damage caused as a result of such defective work, and Contractor shall, upon demand, immediately reimburse Pulte for all Costs incurred responding to such matters and performing all such repairs.

## 11.  GENERAL ENVIRONMENTAL COMPLIANCE

11.1   **Compliance with Applicable Laws**. Contractor and Contractor's Agents shall fully comply with all Applicable Laws regarding the environment and natural resources.

11.2   **Storage of Materials**. Contractor is solely responsible for the proper use, storage and handling of all Materials, including potential pollutants, used in the Work, and for the generation, handling and disposal of all Waste resulting from the Work, in full compliance with all Applicable Laws regarding the environment and natural resources. In addition, Contractor shall immediately notify Pulte if Contractor or Contractor's Agents generate more than 100 kilograms of hazardous waste in any one month on a Project site.

Nc Master Trade Agreement

11.3 **Impacts to Wetlands and Waters**. Contractor and Contractor's Agents shall not (i) cause any unpermitted impacts to wetlands, waters, habitats or designated protected areas, or (ii) violate any permits governing such matters or issued in connection therewith.

11.4 **Vehicles and Equipment**. Contractor and Contractor's Agents shall minimize any vehicle or equipment fueling, washing, maintenance or repair on a Project jobsite and any such activities shall not result in run-off or releases onto the ground or off a Project jobsite or into a storm water management or conveyance system.

11.5 **Remediation**. Contractor will take immediate steps, at Contractor's sole expense, to cause to be remediated in full compliance with and to the full extent required by the Applicable Laws, any release or discharge by Contractor of any hazardous or other regulated substance on or from a Project jobsite.

11.6 **Failure to Correct Non-Compliance**. If Contractor fails to correct any non-compliance with this Section after written notice from Pulte, Pulte may, without assuming any liability therefor, correct such non-compliance and charge the Costs to Contractor.

## 12. STORMWATER MANAGEMENT

12.1 **Compliance with Stormwater Applicable Laws**. Contractor shall fully comply with all Stormwater Applicable Laws, Project NPDES Permit(s), and the Project SWPPP.

12.2 **Contractor's Representative**. Contractor shall designate a Contractor employee representative with authority from Contractor to oversee, instruct, and direct Contractor's employees and Contractor's Agents regarding compliance with the requirements of the Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP. Prior to commencing Work, the designated Contractor representative shall contact Pulte's jobsite stormwater representative to request information on stormwater management at the Project. Contractor and Contractor's Agents shall review prior to commencing Work on the jobsite, and shall abide by at all times, (i) all stormwater and jobsite orientation materials and direction provided by Pulte to Contractor, and as may be required by the Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP, and (ii) file all notifications, plans and forms required by Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP. Contractor is responsible for circulating information provided by Pulte regarding stormwater management to its employees and Contractor's Agents who will be working on the Project.

12.3 **Compliance with SWPPP**. Contractor shall require Contractor's Agents to immediately notify Contractor and Pulte of any source pollutants that Contractor's Agents intend to use on the jobsite that are not identified in the Project SWPPP, and require that each of Contractor's Agents on the Project immediately notify Contractor and Pulte of any corrections or recommended changes to the Project SWPPP that would reduce or eliminate the discharge of pollutants and/or sediments from the jobsite. Further, neither Contractor nor any of Contractor's Agents shall discharge any prohibited non-stormwater discharges to stormwater systems or from the jobsite. If requested by Pulte, Contractor shall annually or at the completion of the Work, certify that the Work was performed in compliance with the requirements of the Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP.

12.4 **Best Management Practices**. Contractor acknowledges that periodic changes may have to be made to the Project SWPPP during the progress of the Work, and Contractor shall at all times comply with, and require that Contractor's Agents at all times comply with, the most current version of the Project SWPPP. Contractor and Contractor's Agents shall use best efforts to comply with the Project SWPPP practices and procedures, including the "best management practices," and Contractor shall implement "best management practices" to control erosion and sedimentation and to prevent the discharge of pollutants. Contractor shall ensure that all of Contractor's and Contractor's Agent's personnel are appropriately trained in the appropriate "best management practices", and trained to comply with the Project SWPPP, Project NPDES Permit(s), and Stormwater Applicable Laws.

12.5 **Notice of Discharge**. Contractor shall immediately notify Pulte if it observes, discovers and/or becomes aware of (i) any spill of any hazardous or toxic substance or material or other pollutants on the jobsite, (ii) any discharge of any hazardous or toxic substance or material or other pollutants into or on the jobsite which leaves the jobsite or is capable of being washed from the jobsite during a rain event, (iii) any failure by any party to comply with the requirements of the Project SWPPP, Project NPDES Permit(s), and Stormwater Applicable Laws, and (iv) any damage to or failure of a "best

12 of 23

management practice" or any other stormwater and erosion and sediment control measure. Contractor shall retain all records relating to the Project SWPPP, Project NPDES Permit(s), and Stormwater Applicable Laws, and any and all violations of the same, for a period of three (3) years following completion of the Project, or longer as required by applicable law.

12.6    **Pulte's Right to Remediate**. Notwithstanding anything to the contrary contained herein, Pulte shall have the right, but not the obligation, to immediately remedy any violation of Stormwater Applicable Laws, Project NPDES Permit(s), and the Project SWPPP for which Contractor is responsible, without the necessity of providing Contractor with any notice or right to cure. Should Pulte remedy any such violation, Pulte shall have the right to back-charge Contractor for the Costs to remedy the violation. Conversely, Pulte shall have the right, in Pulte's sole and absolute discretion, to require Contractor to reimburse Pulte for the Costs incurred by Pulte to remedy such violation and/or for fines or penalties paid for such violation, and unless Contractor reimburses Pulte for such Costs within ten (10) days after receiving Pulte's written request for payment of the same, Contractor will be in default of this Agreement, and Pulte shall have all rights and remedies available to Pulte as a result of a Contractor default. Nothing in this Section shall limit or modify in any way Contractor's obligations or Pulte's rights under other provisions in this Agreement.

## 13.    LABOR MATTERS

13.1    **Not Pulte Employees**. Contractor acknowledges that (i) Contractor, its agents, its employees, or any individual who performs work for or at the request of Contractor is not an employee of Pulte and (ii) Pulte does not govern and is not responsible for any aspect of the employment relationship between Contractor and its employees.

13.2    **Contractor's Employees**. Contractor may recruit, interview, select, and hire individuals who, in Contractor's judgment, are best qualified to perform the Work. At Pulte's request, Contractor shall remove from the Project jobsite any employee who violates any Applicable Laws, makes threats or presents a potential danger to others at the Project jobsite, or improperly interferes with other work being performed at the Project jobsite, provided that this arrangement shall in no way affect the right of Contractor, in its sole discretion, to hire, assign, reassign and/or terminate its employees, contractors and subcontractors. In connection with performance of the Work, Contractor shall:

(a)    comply with any and all applicable federal, state and local equal employment opportunity/non-discrimination/anti-harassment laws and regulations including those precluding discrimination or harassment against any employee or applicant for employment because of race, color, sex, age, national origin, disability and/or any other protected class or status required by law;

(b)    calculate, pay, and record wages and overtime of its employees in full compliance with the Fair Labor Standards Act, which prescribes standards for wages and overtime pay, and all other Applicable Laws. Contractor must seek legal advice and/or contact the U.S Department of Labor at 1-866-4-USA-DOL (1-866-487-2365) or applicable state governmental entity if it has any questions regarding wage and hour compliance;

(c)    calculate and pay all fringe or other benefit payment or contribution, including interest thereon, owed to Contractor's employees or third parties on behalf of Contractor's employees;

(d)    calculate, pay or withhold all required employment related taxes, including payroll taxes, insurance premiums and other government mandated charges for Contractor's employees;

(e)    maintain personnel, payroll, and timekeeping records for its employees;

(f)    ensure that all employees are properly classified under Applicable Laws and that any individuals retained as independent contractors are properly classified as such under Applicable Laws; and

(g)    comply with the Immigration Reform and Control Act of 1986 ("**IRCA**"), and warrant that all employees of Contractor used to provide work or services to Pulte were hired in compliance with IRCA and all other

Applicable Laws concerning the employment and verification of individuals authorized to work in the United States (including timely I-9 verification).

13.3 **Labor Harmony**. Contractor shall maintain labor harmony on the Project jobsite, and shall not employ any persons, means, Materials or equipment which may cause strikes, work stoppages or any disturbances of Contractor's Agents, Pulte or any other contractor or subcontractor on the Project. Contractor shall perform Work with labor that is compatible with that of other trades performing work at the Project jobsite, and Contractor shall exercise all due diligence to overcome any strike or other labor dispute or action.

13.4 **Eligible to Work Legally in the United States**. Contractor is solely responsible for the verification of each of its employee's and Contractor's Agent's eligibility to work legally in the United States. Contractor represents and warrants that: (a) Contractor's employees and Contractor's Agents shall all be eligible to work legally in the United States; (b) Contractor will timely obtain, review and retain all documentation required by all Applicable Laws to ensure that each of its employees and each of Contractor's Agents is eligible to work legally in the United States; (c) Contractor shall comply with all Applicable Laws and other governmentally required procedures and requirements with respect to work eligibility, including all verifications and affirmation requirements; and (d) Contractor shall not knowingly or negligently hire, use, or permit to be hired or used, any person not eligible to work legally in the United States in the performance of the Work.

13.5 **Compliance with Employment Laws**. Contractor understands and agrees that Contractor's compliance with all employment laws is very important to Pulte and is a condition to maintaining its relationship with Pulte. Contractor must immediately inform Pulte if it is audited or investigated by any government body or any employment related lawsuit is filed against it.

## 14. RELATIONSHIP MANAGEMENT

14.1 **Cooperation**. Each party shall reasonably cooperate with the other party in connection with its obligations under this Agreement. Such cooperation shall include informing the other party of all management decisions that the party reasonably expects to have a material effect on the obligations required to be performed by that party under this Agreement.

14.2 **Communication**. Contractor shall maintain electronic communications with Pulte via e-mail or the Internet, and shall establish and maintain such other commercial communication methods and technical systems as Pulte may require from time to time.

14.3 **Verification of Performance of Obligations**. Contractor shall provide Pulte with all reports, documentation and information as Pulte reasonably requests to verify the performance of Contractor's obligations under this Agreement, including full reports of the progress of Work in such detail as may be required by Pulte including any shop drawings, as–built drawings and diagrams in the course of preparation, process, fabrication, manufacture, installation or treatment of the Work.

14.4 **Conduct of Contractor**. Contractor represents and warrants that it: (a) shall perform its obligations and deal with Pulte in good faith and with fair dealing; (b) shall conduct its business in a manner which reflects favorably on Pulte; (c) shall not engage in any deceptive, misleading, illegal or unethical business practices; (d) has not and shall not, directly or indirectly, request, induce, solicit, give or accept any bribe, kickback, illegal payment or excessive gifts or favors to or from Pulte or any Pulte employee, or any third party acting on Pulte's behalf; and (e) has not engaged in and shall not engage in any anticompetitive behavior, price fixing or any other unlawful restraints of trade. Contractor shall immediately provide written notice to Pulte of any of the foregoing upon Contractor's becoming aware of the same.

14.5 **Notice of Litigation or Investigation**. To the extent permissible under Applicable Law or agreement, Contractor shall notify Pulte in writing promptly of: (a) any litigation or arbitration brought against Contractor related to the Work; (b) any actions taken or investigations initiated by any governmental agency in connection with the Work; (c) any legal actions initiated against Contractor by governmental agencies or individuals regarding any illegal activities, including fraud, abuse, false claims or kickbacks; (d) any proceedings by or against Contractor in bankruptcy, insolvency of Contractor, any proceedings for appointment of a receiver or trustee or an assignment for the benefit of creditors or any other similar event. At Pulte's request, and to the extent permissible under Applicable Law or agreement, Contractor shall provide to Pulte all known details of the nature, circumstances, and disposition of any of the foregoing.

DocuSign Envelope ID: B649338E-3EAB-4414-B41C-76FA5AA69A59

## 15. GOALS, CONTINUOUS IMPROVEMENT AND QUALITY

15.1 **Cooperation**. Contractor acknowledges that Pulte's long term goals may include: (a) shortening build-times for the Projects; (b) increasing flexibility; (c) achieving ongoing cost reductions; and (d) achieving specific quality goals and continuous quality improvement. Contractor agrees to cooperate with Pulte in working toward achieving these goals, which includes the obligations set forth in this Section. At least once each contract year at Pulte's request, the parties shall meet to review Contractor's competitiveness regarding pricing, quality, technology and services, with a view to assuring they remain competitive with other contractors in the marketplace.

15.2 **Improvements in Performance of Work**. Contractor understands that Pulte's selection of Contractor as a provider of Work is based in part on Pulte's belief that Contractor is committed to continuing to improve its performance of Work and to find cost savings over the term of this Agreement. Savings may relate to development and implementation of manufacturing efficiencies, feature improvements, component purchase price reductions, engineering breakthroughs or delivery and distribution enhancements that result in lower cost of Work or operating expenses for Contractor or Pulte. To this end, Contractor shall use commercially reasonable efforts to continuously improve the performance and quality of Work, to assist Pulte in achieving costs savings associated with Work, and to reduce Contractor's costs of performing Work, through increases in efficiency and otherwise.

15.3 **Corrective Action Plan**. If Contractor fails to perform Work properly, Contractor shall promptly put into place a written corrective action plan, reasonably acceptable to Pulte, designed to ensure that Contractor will perform Work properly going forward.

## 16. INSPECTIONS AND REVIEWS

16.1 **Review of Books and Records**. At Pulte's request, Contractor shall allow Pulte or its designated representatives to review Contractor's applicable invoices, books and records to the extent necessary to verify Contractor's representations and charges to Pulte and compliance with this Agreement. Contractor shall reasonably cooperate with Pulte or its designated representatives in connection with such review. Upon completion of any such review, Pulte and Contractor shall review the report together and work in good faith to agree upon any adjustment of charges (including any reimbursement of overpayments) resulting from the review.

16.2 **Inspections**. Pulte and its agents shall have the right to inspect all Materials, facilities, Project jobsites and surrounding areas, to confirm Contractor's compliance with the requirements of this Agreement, including OSHA compliance. No inspection or failure to inspect by or on behalf of Pulte will increase Pulte's obligations or liabilities nor limit Pulte's rights or Contractor's obligations.

## 17. INDEMNIFICATION

17.1 **Indemnity**. To the extent permitted by law, Contractor hereby releases, covenants not to sue, and shall indemnify, defend and hold harmless Indemnitees from and against any and all Claims proximately caused by: (a) the performance or nonperformance of the Work, (b) defects in the Materials, (c) Contractor's or Contractor's Agents' failure to comply with the Stormwater Applicable Laws, NPDES Permit(s), or the Project SWPPP, (d) Contractor's or Contractor's Agents' failure to comply with the Fair Labor Standards Act, IRCA, or any other Applicable Laws concerning labor or employment, or (e) any other breach of this Agreement.

17.2 **Statutory Limits Inapplicable**. In any and all Claims against any Indemnitee brought by Contractor or Contractor's Agents, the indemnification obligation hereunder shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for Contractor or Contractor's Agents under workers' or workman's compensation acts, disability benefit acts or other employee benefit acts.

17.3 **Indemnification and Defense Obligations**. Contractor's indemnification and defense obligations shall not be limited by the amounts or types of insurance that Contractor is required to carry under this Agreement or that Contractor does in fact carry.

17.4 **Homeowner Claims**. In the event any Indemnitee is required to mediate or arbitrate a Claim with a homeowner arising out of or relating to Work, an Indemnitee may, in its sole discretion, require Contractor to participate in

Case 3:23-cv-00177-KDB-DCK   Document 1-2   Filed 03/24/23   Page 27 of 80

the mediation and/or arbitration in accordance with the Federal Arbitration Act, and pursuant to the applicable rules of the American Arbitration Association (or other applicable arbitration rules) as determined by Pulte's contract with the homeowner and/or any limited warranty provided to the homeowner. Any award rendered by the arbitrator may be confirmed, entered and enforced in any court having jurisdiction and Contractor and the Indemnitee(s) shall be bound by that decision.

17.5    **Survival**. The provisions of this Section 17 shall survive expiration or termination of this Agreement or completion of the Work and shall continue until such time it is determined by final judgment that the Claim against Indemnitees is fully and finally barred by the statute of limitations. The indemnification obligations shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which otherwise exists in favor of Pulte or any Indemnitee.

17.6    **Compliance with Law**. Pulte and Contractor agree that the indemnification obligations of Contractor set forth in this Agreement are intended to comply with N.C. G.S. 22B-1 (the "**Statute**"). In the event of a conflict or inconsistency between such indemnification obligations and the Statute, the terms and conditions of the Statute shall control to the extent of such conflict or inconsistency.

**18.    INSURANCE.** Contractor shall carry, with insurance companies rated A- VII or better by A.M. Best Company, the following insurance coverage continuously during the life of this Agreement, and thereafter as provided below:

18.1    **Commercial General Liability Coverage**.

(a)    Commercial General Liability Insurance (**"CGL"**) coverage shall be on an occurrence form containing limits of at least $1,000,000.00 per occurrence/$1,000,000.00 general aggregate/$1,000,000.00 products-completed operations, protecting against property damage, bodily injury and personal injury claims arising from the exposures of:

(i)    Premises or ongoing operations;

(ii)    Products-completed operations, which shall:

(A)    cover materials designed, furnished and/or modified in any way by Contractor;

(B)    have a separate aggregate limit at least equal to the CGL per occurrence limit; and

(C)    be maintained through the longer of the statute of limitations or repose period for construction defect and products liability claims in the state where the Work is performed. Policies and/or endorsements cannot include any provisions that terminate products-completed operations coverage at the end of a policy period or limit the coverage in any other way with respect to additional insureds;

(iii)    Independent contractors;

(iv)    Contractual liability; and

(v)    Property damage resulting from explosion, collapse, or underground (x, c, u) exposures (if applicable).

(b)    The CGL coverage must be primary. Any of Pulte's insurance shall be considered excess for the purpose of responding to claims. The following wording must be included in the Description of Operations on the Certificate of Insurance: "This insurance is Primary and Non-Contributory."

(c)    Contractor's CGL policy includes a waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates, by referencing and attaching the required endorsement.

(d)    The policy shall not contain exclusions for the Work, including exclusions for residential construction, attached product (if applicable), liability that arises from a dispute governed by a notice and opportunity to repair statute, or any Contractor's Agent's Work or injuries to its employees or agents (if Contractor subcontracts any portion

of the Work). For attached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction, condominiums, multi-family, or multi-unit dwelling." For detached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction."

     (e)    PulteGroup, Inc., its subsidiaries and affiliates, shall be named as additional insureds on the CGL policy by having the insurance carrier issue an additional insured endorsement(s) at least as broad as the ISO CG 2010 11/85 Additional Insured - Owners, Lessees or Contractors - Form B endorsement. Such additional insured status under the CGL policy shall not be limited by amendatory language to the policy. Further, this endorsement shall:

         (i)    Provide coverage for both premises/ongoing operations **and** products-completed operations to the benefit of the additional insured; and

         (ii)    Provide coverage to the full extent of the actual limits of Contractor's coverage even if such actual limits exceed the minimum limits required by this Agreement.

     (f)    Owners and Contractors Protective Liability Policies **cannot fulfill the requirement for CGL coverage** under this Agreement.

     (g)    In the event that Contractor opts to participate in any alternative general liability insurance program offered through Pulte as a means to fulfill the requirement for CGL coverage, Contractor agrees that Pulte may deduct premium payments due Contractor under this Agreement.

     (h)    In the event that Contractor provides Work for a Project covered by an Owner Controlled Insurance Program arranged by Pulte, the CGL requirements are hereby waived for purposes of that Project only.

    18.2    **Automobile Liability Coverage**. Contractor shall carry automobile liability coverage with a combined single limit of $1,000,000 insuring against bodily injury and/or property damage arising out of the operation, maintenance, use, loading or unloading of any auto including owned, non-owned, and hired autos. PulteGroup, Inc., its subsidiaries and affiliates, shall be named as additional insureds on the automobile liability policy.

    18.3    **Workers' Compensation and Employer's Liability Coverage**.

     (a)    Contractor shall carry workers' compensation insurance providing statutory benefits imposed by applicable state or federal law such that: (1) Pulte shall have no liability to Contractor, its employees or Contractor's Agents; and (2) Contractor shall satisfy all workers' compensation obligations imposed by state law.

     (b)    This policy shall include a **documented** waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates (in states where permitted).

     (c)    If any of Contractor's employees or Contractor's Agents are subject to the rights and obligations of the Longshoremen and Harbor Workers Act or any other maritime law or act, the workers' compensation insurance must be broadened to provide additional required coverage.

     (d)    For purposes of worker's compensation coverage, Contractor agrees that Contractor, Contractor's employees and Contractor's Agents are not employees of Pulte, and are therefore not beneficiaries of any Pulte coverage.

     (e)    Contractor may satisfy its workers' compensation obligations by providing documentation of current authorization from the appropriate state authorities for the state(s) where the Work is performed indicating that Contractor is adequately self-insured for workers' compensation claims.

     (f)    Contractor shall carry employer's liability coverage with limits of not less than:

         (i)    $500,000    Each Accident

         (ii)    $500,000    Aggregate Policy Limit for Disease

         (iii)    $500,000    Each Employee

DocuSign Envelope ID: B649336E-3EAB-4414-B41C-76FA5AA69A59

18.4 **Pollution Liability Insurance**. Contractor shall carry the insurance required under this Section 18.4 if any of the Work involves demolition; disturbing or otherwise handling asbestos containing materials, lead based paint, pollutants or hazardous or toxic materials; mold remediation or similar environmental scopes of work.

(a) Contractor shall carry Pollution Liability insurance ("PL") coverage with limits of at least $5,000,000.00 per occurrence and in the aggregate insuring against losses for Clean-up, Bodily Injury, Property Damage or Natural Resource Damage that Contractor becomes liable to pay to a third party, including local, state or federal government, for a pollution release, including contaminants associated with asbestos, lead based paint, PCB's or other pollution conditions, arising from Work performed at a Project.

(b) The PL policy shall include coverage for loss due to loading, transporting or unloading of asbestos, lead-based paint or other products or hazardous or toxic substance or material performed by or on behalf of Contractor or Pulte.

(c) If PL coverage is carried on a claims made basis, the policy limits must be at least $5,000,000.00 per claim and in the aggregate, or limit carried, whichever is greater, and the PL policy must be in effect as of the date of commencement of performance of the Work and be maintained for a minimum of three (3) years thereafter.

(d) PulteGroup, Inc., its subsidiaries and affiliates, shall be named as additional insureds on the PL policy.

18.5 **Umbrella or Excess Coverage.** To the extent Contractor carries umbrella or excess insurance above the minimum required limits stated in this Agreement, the protection afforded the additional insureds in the umbrella or excess liability insurance shall be as broad or broader, than the coverage in the underlying insurance and in accordance with this Agreement. Each umbrella or excess liability policy shall specifically state that the insurance provided by Contractor shall be considered primary.

18.6 **Deductibles**. Contractor shall disclose all applicable policy deductibles and/or self-insured retentions ("**SIR**") and be liable for all costs within the deductibles and/or SIR.

18.7 **Certificates of Insurance**. Prior to commencement of the Work, Contractor shall evidence that such insurance is in force by furnishing Pulte with a certificate of insurance, or if requested by Pulte, certified copies of the policies. Notwithstanding the non-renewal or termination of this Agreement, Contractor shall provide renewal certificates and endorsements to Pulte for so long as the applicable insurance is required to be maintained pursuant to this Section 18. Renewal certificates shall be provided at least 10 days prior to expiration of the policy. The certificate shall evidence the requirements of this Agreement and specify that:

(a) PulteGroup, Inc., its subsidiaries and affiliates, are additional insureds on the CGL and automobile policies, and if applicable the umbrella and/or excess policies, by referencing and attaching the required endorsement;

(b) The policy does not contain exclusions for the Work and/or for duties performed by Contractor pursuant to this Agreement, including residential construction, attached product (if applicable), or liability that arises from a dispute governed by a notice and opportunity to repair statute. For attached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction, condominiums, multi-family, or multi-unit dwelling." For detached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction."

(c) Contractor's coverage is primary and Pulte's insurance is excess for any Claims. The following wording must be included in the Description of Operations on the Certificate of Insurance: "This insurance is Primary and Non-Contributory;"

(d) Contractor's CGL policy contains contractual liability coverage;

Case 3:23-cv-00177-KDB-DCK    Document 1-2    Filed 03/24/23    Page 30 of 80

(e) Contractor's workers' compensation policy includes a waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates (in states where permitted), by referencing and attaching the required endorsement;

(f) Contractor's CGL policy includes a waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates, by referencing and attaching the required endorsement; and

(g) Contractor must provide evidence of workers compensation in the states(s) that it operates by either listing on the certificate those states listed in item 3.A. of the Information Page of the workers compensation Policy or attaching a copy of the Information Page.

18.8 **Contractor's Agent(s)**.

(a) If Contractor subcontracts any portion of the Work, Contractor shall nevertheless be bound to indemnify Indemnitees as provided in this Agreement on behalf of Contractor's Agent(s). Contractor shall require that Contractor's Agent(s) indemnify Indemnitees as provided in this Agreement and carry insurance as set forth in this Agreement prior to permitting Contractor's Agent(s) to commence such portion of the Work.

(b) Contractor shall require in its purchase orders that its suppliers indemnify Contractor and Indemnitees from all claims arising from any Materials included in any Work.

18.9 **Modifications**.

(a) Any attempt by Contractor to cancel or modify insurance coverage required by this Agreement, or any failure by Contractor to maintain such coverage, shall be a default under this Agreement and, upon such default, Pulte will have the right to immediately terminate this Agreement and/or exercise any of its rights at law or at equity. In addition to any other remedies, Pulte may, at its discretion, withhold payment of any sums due under this Agreement until Contractor provides adequate proof of insurance.

(b) The amounts and types of insurance set forth above are minimums required by Pulte and shall not substitute for an independent determination by Contractor of the amounts and types of insurance which Contractor shall determine to be reasonably necessary to protect itself and its Work.

## 19. TERMINATION

19.1 **By Contractor**. Contractor may terminate this Agreement if Pulte commits a material breach of this Agreement and fails to cure such breach within 30 days of its receipt of written notice of the breach from Contractor.

19.2 **By Pulte**. Pulte may terminate this Agreement or any individual Work Order, with or without cause, effective upon notice to Contractor. A termination "for cause" includes circumstances where: (a) Contractor fails to comply with this Agreement; (b) Contractor indicates or makes any statements indicating that Contractor will not perform its obligations under this Agreement; (c) in the event of any proceedings by or against Contractor in bankruptcy, insolvency of Contractor, any proceedings for appointment of a receiver or trustee or an assignment for the benefit of creditors or any other similar event; (d) Contractor refuses or neglects to supply a sufficient quantity of Work of proper quality, as determined by Pulte; (e) Contractor fails to make prompt payment to Contractor's Agents or for Materials, equipment or labor; (f) Contractor violates any Applicable Law; or (g) Contractor is listed by the administrative office of an applicable employee benefit trust, including by way of illustration but not of exclusion, health, welfare, pension, vacation or apprenticeship trust, as being delinquent in the payment to any such trust, regardless of the construction project upon which delinquency occurred.

(a) Pulte's total liability to Contractor upon termination of any Work Order without cause shall be limited to payment for completed Work, including any retainage, delivered and accepted by Pulte.

(b) If Pulte terminates any Work Order for cause, Pulte may immediately provide any required labor and Work and Contractor shall reimburse and pay Pulte for all Costs. Pulte may deduct all such Costs from any money then due or thereafter to become due to Contractor under any Work Order.

19.3 **Post-Termination Obligations**. Upon expiration or termination of this Agreement for any reason, Contractor will, at Pulte's request, continue to provide Work pursuant to the terms of this Agreement, and provide reasonable transition assistance services to prevent disruption in Pulte's business activities, for a period of up to 3 months after the termination date. At Pulte's request, Contractor will promptly vacate the Project jobsite(s), remove all of its supplies, scaffolding, tools, facilities, appliances, fans and other equipment from the Project jobsite(s), complete all of Contractor's clean-up and other obligations, and otherwise reasonably cooperate with Pulte in winding down Contractor's participation on the applicable Project(s).

19.4 **Survival**. All provisions of this Agreement which by their nature should survive termination of this Agreement shall survive termination of this Agreement, including those provisions related to confidentiality, warranty, indemnification, insurance, waivers, releases and limitations of liability.

## 20. **CONFIDENTIALITY AND PUBLICITY**

20.1 **Confidentiality**. During the term of this Agreement, Contractor may have access to information that is considered confidential and proprietary by Pulte. This information may include non-public information relating to prices, compensation, research, products, services, developments, inventions, processes, protocols, methods of operations, techniques, strategies, programs (both software and firmware), designs, systems, proposed business arrangements, results of testing, distribution, engineering, marketing, financial, merchandising or sales information, individual customer profiles, customer lists or aggregated customer data, and similar information of a sensitive nature (**"Confidential Information"**). Contractor may use Confidential Information only for the purposes of this Agreement and Work Orders. Contractor shall maintain the confidentiality of Confidential Information in the same manner in which it protects its own Confidential Information of like kind, but in no event shall Contractor take less than reasonable precautions to prevent the unauthorized disclosure or use of Confidential Information. Upon request, Contractor shall return all Confidential Information and shall not use Confidential Information for its own, or any third party's benefit. The provisions of this Section shall survive termination of this Agreement for so long as the Confidential Information is considered confidential by Pulte.

20.2 **Publicity**. Contractor shall not use any Pulte trademarks, service marks, trade names or logos or refer to Pulte directly or indirectly in any marketing materials, customer lists, media release, public announcement or other public disclosure relating to this Agreement or its subject matter without obtaining Pulte's prior written consent.

## 21. **GENERAL TERMS**

21.1 **Time is of the Essence**. Time is of the essence in connection with all of Contractor's obligations under this Agreement.

21.2 **Force Majeure**. Subject to the terms of this Agreement, neither Party shall be liable for any failure or delay in performing its obligations hereunder during any period in which such performance is prevented or delayed by any Force Majeure Event.

21.3 **Independent Contractor Relationship**. The relationship between Pulte and Contractor is that of independent contractor. Nothing in this Agreement shall be construed as creating a relationship between Pulte and Contractor of joint venturers, joint employers, partners, employer-employee, or agent. Neither party has the authority to create any obligations for the other, or to bind the other to any representation or document. Pulte does not control the Work or Contractor's employees, and Contractor is solely responsible for management and all other employer functions with respect to its employees.

21.4 **Continued Performance**. Each party shall continue performing its obligations under this Agreement while any dispute submitted to litigation or any other dispute resolution process is being resolved until such obligations are terminated by the expiration or termination of this Agreement or by a final and binding award, order, or judgment to the contrary.

21.5 **Cooperation**. Where agreement, approval, acceptance, consent or similar action by either party is required by any provision of this Agreement, such action shall not be unreasonably delayed or withheld unless otherwise expressly permitted.

21.6 **Cumulative Rights**. All warranties provided by Contractor, and all of Pulte's rights and remedies set forth in this Agreement, are cumulative and are in addition to all other warranties, rights and remedies provided to Pulte by this Agreement, any other document, or at law, in equity or otherwise.

21.7 **Third Party Beneficiaries**. The parties agree that: (a) this Agreement is for the benefit of the parties to this Agreement and is not intended to confer any rights or benefits on any third party (including any employee of either party) other than the Indemnitees; and (b) there are no third-party beneficiaries to this Agreement, or any specific term of this Agreement, other than the Indemnitees.

21.8 **Entire Understanding of the Parties**. This Agreement contains the entire understanding of the parties with respect to the subject matter addressed herein and supersedes, replaces and merges all prior understandings, promises, representations and agreements, whether written or oral, relating thereto. Upon execution of this MTCA, and any renewal thereof, the terms of this MTCA shall apply to all then-outstanding Work Orders or other agreements between Pulte and Contractor. Both parties contributed to the drafting of this Agreement, and had the advice of counsel, and therefore agree that this Agreement should not be construed in favor of either party.

21.9 **No Modification Except in Writing**. Except as expressly provided herein, this Agreement may not be modified except by a writing signed by both parties.

21.10 **Construction of Terms**. As used in this Agreement, the word **"shall"** is always mandatory and not discretionary; the word **"may"** is permissive; the word **"includes"** means "includes without limitation" and the word **"including"** means "including without limitation" or "including but not limited to."

21.11 **No Waiver**. Any waiver of a party's right or remedy related to this Agreement must be in writing, signed by that party to be effective. No waiver shall be implied from a failure of either party to exercise a right or remedy. In addition, no waiver of a party's right or remedy shall effect the other provisions of this Agreement.

21.12 **Choice of Law and Forum Selection**. This Agreement shall be governed by the laws of the State in which the Work is performed and the federal laws of the United States. Except as otherwise provided in this Agreement, any litigation arising between the parties in relation to this Agreement shall be initiated and maintained in the state or federal courts in the State in which the Work is performed.

21.13 **Attorneys' Fees and Costs**. In any action, suit or arbitration proceeding arising out of or relating to this Agreement or any breach or alleged breach thereof, the losing party shall pay to the prevailing party all reasonable expenses incurred by the prevailing party, including, without limitation, costs, expenses and reasonable attorneys' fees. The prevailing party is the party who receives substantially the relief sought whether by judgment, summary judgment, dismissal, settlement or otherwise. In any suit, action, proceeding or arbitration primarily for the recovery of monetary damages, the award of reasonable attorneys' fees may not exceed the monetary damages awarded. This provision is intended to comply with N.C. Gen. Stat. § 6-21.6.

21.14 **Unenforceable Provisions**. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, such provision will be enforced to the fullest extent that it is valid and enforceable under Applicable Law. All other provisions of this Agreement will remain in full force and effect.

21.15 **Notice**. Any demand, request or notice which either party desires or may be required to make or deliver to the other shall be in writing and delivered by electronic mail transmission, personal delivery, reputable overnight courier, or registered or certified mail, return receipt requested, postage prepaid, addressed as set forth on page 1 or to such other address and person as either party may communicate to the other by written notice. Any notice or communication shall be deemed to have been given and received on the earliest of the following: (i) on the date of transmission, if delivered by electronic mail transmission on or before 5:00 p.m. on a business day, provided that written notice by one of the other approved methods of delivery is sent on the same day; (ii) on the next business day after transmission, if delivered by electronic mail transmission after 5:00 p.m. or on a Saturday, Sunday or state holiday, provided that written notice by one of the other approved methods of delivery is sent on the same day; (iii) on the date of delivery (or the first business day thereafter if delivered on a Saturday, Sunday or state holiday), if hand delivered or sent by overnight courier, with a written acknowledgement of receipt; or (iv) three (3) business days after the date of mailing, if sent by registered or certified mail,

Nc Master Trade Agreement

return receipt requested, postage prepaid. Notices given by legal counsel for any Party shall constitute notice from that Party. Notice by facsimile transmission is not an authorized form of notice under this Agreement.

      21.16   **Assignment**. Neither party may assign this Agreement, in whole or in part, without the other party's prior written consent, which shall not be unreasonably withheld or delayed. Any attempted assignment without such written consent shall be void. Notwithstanding the foregoing, Pulte may assign this Agreement without Contractor's consent: (a) to one or more Affiliates, provided that each such Affiliate agrees to be bound by this Agreement; and (b) as reasonably necessary in connection with any merger, acquisition, sale of assets or other corporate restructuring. Subject to the provisions of this Section, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

## 22.    WAIVER OF JURY TRIAL. FOR THEIR MUTUAL BENEFIT, PULTE AND CONTRACTOR WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.

Exhibits to this Agreement consist of: *[Pulte Homebuilding Operations to identify additional Exhibits]*

     Exhibit A: Scope of Work

     Exhibit B: Job Site Rules

     Exhibit C: Environmental Scope of Work

     Exhibit D: Qualified Representative

DocuSign Envelope ID: B649338E-3EAB-4414-B41C-75FA5AA69A59

**AGREED AND ACCEPTED:**

**Pulte**

LS FRAMING INC
_____

(Contractor's Full Legal Company Name)

By: _Joseph Randolph Kirby III_
      1B256332AFC744F
        (signature)

By _Omar Santos_
     4F9BC8BF066E42F
       (signature)

Name: _Joe Kirby_

Name Omar Santos

(printed)

Title: _Procurement Manager_

(printed)

Title PRESIDENT

Date: 10/23/2019

Date 10/22/2019

Nc Master Trade Agreement

**EXHIBIT**

**B**

### Master Trade Contractor Agreement

| | | | |
|---|---|---|---|
| Effective Date: 11/11/2019 | | | |
| Company | Full Legal Company Name: **Pulte Home Company, LLC** | | |
| | Division(s): **Charlotte** | | |
| | Address: **11121 Carmel Commons Blvd Ste 450** | Phone: **704-414-7055** | |
| | City: **Charlotte** | General Contractor License No.: 19311 | |
| | State: **NC** | Zip: **28226** | Email of Company Contact: **Joe.Kirby@PulteGroup.com** |
| | Authorized Representative: **Joe Kirby** | Cell Phone: **980-722-2981** | |
| Contractor | Full Legal Company Name: `Installed Building Products, LLC dba B-Organized Insulation, LLC` | | |
| | Vendor Number (if assigned by Pulte): `461BOR101` | | |
| | Contractor License No.: `N/A` | | |
| | Employer I.D. No.: `461BOR101` | | |
| | Address: `6051-E Lakeview Road` | Phone: `704-395-0033` | |
| | City: `Charlotte` | | |
| | State: `NC` | Zip: `28269` | Email of Contractor Contact: `brian.hutto@installed.n` |
| | Authorized Representative: `Brian Hutto` | Cell Phone: `704-400-6929` | |
| Premier (lien agent) | Premier Land Title Company | | |
| | Address: c/o LiensNC, 19 W. Hargett Street, Suite 507 | | |
| | City: Raleigh | Phone: (888) 690-7384 | |
| | State: North Carolina | Zip: 27601 | Fax: (919) 489-5231 |
| | Website: www.liensnc.com | | |

THIS MASTER TRADE CONTRACTOR AGREEMENT ("**MTCA**") is by and between Company and its Affiliates engaged in residential homebuilding activities in the Division's market area (collectively, "**Pulte**") and Contractor, and is effective on the date set forth above.

1. **DEFINITIONS**

"**Affiliate**" means any person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with a party. As used in this definition "control" (including, with correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or other ownership interest, by contract or otherwise).

"**Agreement**" means: (a) this MTCA; (b) Work Orders; (c) exhibits to this MTCA; and (d) any amendments to this Agreement.

"**Applicable Laws**" means all applicable local, state and federal ordinances, laws, rules and regulations, including building codes, safety laws, FHA/VA requirements, occupational safety and health standards promulgated by the Secretary of Labor under OSHA, the Fair Labor Standards Act, the Immigration Reform and Control Act of 1986, any other federal

or state labor or employment law, and environmental and natural resource laws, rules and regulations, including ordinances and policies.

"**Authorized Representative**" means the individual designated by each party to be principal point of accountability for coordinating and managing that party's obligations under this Agreement.

"**Change**" means a modification, alteration or deviation in the Work, or additional services not described in the applicable Work Order.

"**Claim**" or "**Claims**" means any and all claims (including personal injury, bodily injury, death or property damage), demands, suits, actions, proceedings, citations, fines, penalties, obligations, damages, losses, liabilities, liens, awards, judgments, costs or expenses (including attorneys' fees and costs, expert witness fees and costs and other expenses of any litigation, mediation, arbitration, judicial reference or other legal proceeding of any kind incurred as a result of such claims or in enforcing the indemnity obligations set forth in this Agreement), of every kind or nature, whether based on tort, contract, or equitable principles.

"**Construction Schedule**" means the schedule for a Project, including the Work to be performed by Contractor, that is prepared by Pulte and provided to Contractor.

"**Contractor's Agents**" means suppliers, subcontractors, laborers, materialmen, engineers, agents, consultants and other persons from which Contractor purchases or contracts for labor and Materials required to perform the Work and any other entity or person under the direction of Contractor.

"**Costs**" means all direct and indirect costs, fees, damages, fines, penalties, and all other expenses incurred or paid by Pulte in connection with the Work or this Agreement, including costs of Materials, labor costs, equipment costs, production stoppage costs, and legal fees and expenses.

"**Force Majeure Event**" shall mean any delay caused by any condition beyond the reasonable control of either Pulte or Contractor, such as an act of God; fire or other casualty; delay caused by any governmental authority unrelated to any act of failure to act by either Pulte or Contractor; any act of terrorism or sabotage; and/or a civil riot. Any strike or other labor difficulties shall not be considered a Force Majeure Event for the purposes of this Agreement if such labor difficulties are caused by the action or inaction of Contractor.

"**Indemnitees**" means Pulte and its members, managers, shareholders, subsidiaries and Affiliates, and the officers, directors, shareholders, insurers, representatives, agents, employees, successors and assigns of all such parties.

"**Liens**" shall refer to any and all mechanics' liens, materialmens' liens, construction liens, stop notice or bond claims or any attachments, levies, garnishments, or suits.

"**Materials**" means any and all materials and supplies included with or used in connection with Work which may be designated by Pulte in the Specifications for a Project.

"**NPDES Permit(s)**" means a permit obtained by Pulte under the National Pollutant Discharge Elimination System ("**NPDES**") for a Project.

"**Project**" means a Pulte community or building project or any other project designated by Pulte.

"**Specifications**" means all plans, reports, drawings, sketches, renderings, specifications, option lists and other related documents in connection with any Project, including specific trade scopes of work, Take-off, job-site specifications, Pulte Construction Standards, working drawings and all revisions thereto made throughout the progress of the Project.

"**Stormwater Applicable Laws**" means the Federal Water Pollution Control Act of 1972, as amended, and all federal, state and local laws, rules, regulations, ordinances, and policies relating to stormwater pollutants, sedimentation control and erosion control.

"**SWPPP**" means an erosion, sedimentation, and stormwater pollution prevention plan prepared by Pulte for a Project to comply with the NPDES, and other requirements, in order to control pollutant, erosion, sediment, and stormwater discharges and to prevent certain non-stormwater discharges.

"**Take-off**" means a detailed list of Materials with quantities and units of measure that are required to perform the Work on a Project.

"**Warranty Period**" shall be the period of time beginning on the date of Contractor's commencement of the Work and continuing until the later to expire of: (a) the applicable home warranty period provided to customers of Pulte, as posted at www.pulte.com; or (b) any express, implied or other warranty for the Work or Materials required by Applicable Laws.

"**Waste**" means waste material, spoils, dirt, mud, scrap, debris, trash, excess Materials and rubbish.

"**Work**" means the construction and services required by or reasonably inferred from this Agreement, whether completed or partially completed, and includes all other labor and Materials provided or to be provided by Contractor to fulfill Contractor's obligations. The Work may constitute the whole or a part of a Project. Touchup work, punch list work and minor patching are considered a part of the Work.

"**Work Orders**" include any combination of: (a) a purchase order, release, Schedule A or other request for Work and any Changes; (b) job initiation order or notice to proceed; (c) Specifications; and (d) the Construction Schedule. Work Orders may be in written or electronic format, and may be provided by or through any media, platform or mode of communication selected by Pulte.

"**Work Price**" means the agreed upon price for Work set forth in the applicable Work Order. If Pulte has an agreement for direct pricing with a manufacturer or supplier of Materials, prices for such Materials shall in no event exceed any prices agreed to between Pulte and the applicable Material manufacturer or supplier. Contractor agrees that any price reduction applicable to Materials subsequent to the Work Order date, but prior to delivery, shall be applicable to the Work Price.

## 2. BACKGROUND

2.1     **Purpose**. Pulte and Contractor desire to enter into a business relationship covering Contractor's provision of Work in connection with Projects. This MTCA sets forth the terms under which Pulte may request and Contractor shall provide Work.

2.2     **Term of Agreement**. This Agreement shall be effective on the Effective Date and continue for an initial term of 2 years, unless earlier terminated in accordance with its terms. This Agreement shall automatically renew on the same terms for consecutive 1 year terms unless either party provides written notice of its intent not to renew this Agreement, not less than 90 days prior to the expiration of the initial term or then-current term. In the event that Contractor elects not to renew this Agreement, Contractor nevertheless shall complete all outstanding Work Orders in accordance with the terms of this Agreement and the relevant Work Orders.

2.3     **Order of Precedence**. The provisions of the documents comprising the Agreement shall, to the extent possible, be interpreted consistently, and in a manner so as to avoid conflict. In the event of a conflict or inconsistency, the following order of precedence shall apply: (i) any amendments to this MTCA; (ii) the terms of this MTCA; (iii) exhibits to this MTCA; (iv) the applicable Work Order.

2.4     **Conflicts and Inconsistency with Other Documents**. Any and all terms on any other agreements, contracts, proposals, bids, acknowledgements, invoices or other documentation are void to the extent of any conflict and/or inconsistency with this Agreement.

## 3. ORDERING PROCESS

3.1     **Specifications**. During the term of this Agreement, Pulte may make available Specifications and related documents and information to Contractor related to a specific Project, and ask Contractor for a bid or proposal for Work. If requested by Pulte, Contractor may, at no cost to Pulte, work on the initial development of the Specifications for a specific Project, provided that such assistance by Contractor shall not entitle Contractor to any Work Orders.

Nc Master Trade Agreement

3.2 **Jobsite Inspection**. In connection with Contractor's bid or proposal for Work, Contractor shall: (a) inspect the applicable Project jobsite, if necessary, available and accessible, and review the Specifications for the Project in formulating and preparing its bid or proposal; (b) identify all proposed Contractor's Agents; (c) provide all information requested by Pulte, including detailed take-offs, specifications and literature for Materials, quantities, unit costs, labor costs and hours, submittals, shop drawings, insurance costs and other overhead; and (d) investigate and confirm that its proposed Work complies with all Applicable Laws and immediately notify Pulte in writing of any portion of the Work that does not so comply.

3.3 **Ownership**. Contractor agrees that all Specifications, including copies thereof, are the property of Pulte and are not to be used on other work or given to other parties, except as required for the Work. Pulte shall be deemed the author and owner of the Specifications and shall retain all common law, statutory and other reserved rights, including copyright. All Specifications and all copies thereof shall be returned to Pulte upon completion of the Work.

3.4 **Work Orders**. During the term of this Agreement, Pulte may issue Work Orders to Contractor for Work. Items of Work omitted from Work Orders or Specifications that are clearly inferable from the information presented therein shall be provided and performed by Contractor, and shall be deemed to be part of the Work, at no additional cost to Pulte. Contractor shall immediately notify Pulte of any discrepancy, error, conflict or omission discovered by Contractor in the Work Orders or Specifications at any time.

3.5 **Changes to Work Orders**. If Pulte requests a Change that increases the cost of the Work, Contractor shall provide to Pulte, within a reasonable time, not to exceed 3 business days, a written report stating the estimated cost of such Change and estimated time to incorporate the Change into the Work and the impact upon the Work Price. Any mutually agreed Change that increases the Work Price for the applicable Work Order shall be set forth in writing as an amendment to the applicable Work Order. Any such Change shall contain a detailed description of the additional Work, a completion date and the amount(s) and schedule of payment of the Work Price authorized for such Change. Pulte shall have the right to request a Change that does not increase the cost of the Work. Pulte shall have the right to delete any portion of the Work described in a Work Order by giving at least 1 business day written notice to Contractor. The Work Price will be reduced by an amount equal to the price of the deleted Work determined by applying the same cost structure for Materials, labor, overhead and profit utilized in calculating the original Work Price.

3.6 **No Guarantee of Work**. This is a non-exclusive agreement and nothing herein constitutes a promise, guarantee, representation or commitment of any minimum or specified number of opportunities or that any Work Orders will be issued to Contractor. Contractor is not obligated to accept any Work Orders from Pulte, and Contractor shall accept or decline any Work Order, in writing, within 2 business days after issuance of the proposed Work Order by Pulte.

## 4. **INITIATION OF WORK**

4.1 **Notice to Proceed**. Unless the Work Order specifies otherwise, Contractor shall have no authority to commence Work at any location of the Project until Contractor has received notice to proceed from Pulte.

4.2 **Permits**. Contractor shall, at its sole cost, obtain all permits required for Contractor to perform the Work, other than general building permits, which shall be provided by Pulte.

4.3 **Licensing**. Contractor must be properly authorized to do business in every jurisdiction where it shall perform the Work, and properly licensed to perform the Work by all necessary governmental authorities. Contractor shall maintain current copies of all licenses and certificates of competency required by all jurisdictions where Contractor shall perform Work and provide current copies of these documents to Pulte within 2 business days of request by Pulte.

4.4 **Jobsite Inspection**. Contractor, prior to commencing Work on the Project, or at any subsequent time as reasonably necessary, shall:

    (a) inspect the then-current state of the Project jobsite and review the latest version of the Specifications and Construction Schedules for the Project;

    (b) ascertain the jobsite conditions to be encountered in the performance of the Work;

(c)     report any discovered damage to Pulte;

(d)     verify that all Work, storage and access areas and surfaces related to or adjoining the Work are satisfactory for the commencement of the Work; and

(e)     notify Pulte of any discrepancy, error, conflict or omission discovered by Contractor regarding the Project, Specifications or Work Order.

4.5     **Acceptance of Jobsite**. The commencement of the Work by Contractor shall be deemed as Contractor's acceptance of the jobsite and all access and storage areas.

## 5.    PERFORMANCE AND PROGRESS OF WORK

5.1     **Performance of Work**. Contractor shall perform all Work described in the applicable Work Order in accordance with this Agreement.

5.2     **Instructions to Contractor**. From time to time Pulte may issue instructions to Contractor identifying the Work to be performed at each specific location within the Project, and establishing a Construction Schedule for that portion of the Work. Pulte may also direct that certain parts of the Work be prosecuted in preference to others in order to maintain the progress of the Project.

5.3     **Review**. Contractor shall stay informed regarding all changes in the jobsite, Specifications and Construction Schedules throughout the course of the Project. Contractor shall review the Construction Schedule daily to verify, prior to commencing any Work, any Changes and that the Materials, colors, options, elevations and orientation of the garage on the lot are correct.

5.4     **Costs of the Work**. Contractor shall furnish, at its own cost and expense, all labor, Materials, tools, equipment, facilities, scaffolding, light, appliances, fans, and any water pumping necessary to perform the Work. To the extent not otherwise provided, Contractor shall also furnish at its own cost and expense, electricity and heat necessary to perform the Work. Contractor shall pay all taxes, royalties and license fees applicable to such items furnished by Contractor and forms and methods used by Contractor in the performance of this Agreement. Contractor shall secure and pay for all government approvals necessary for the use of such items. If Contractor uses Pulte's equipment or facilities, then Contractor shall reimburse Pulte, at a pre-determined rate prior to use thereof.

5.5     **Personnel**. Contractor shall have the necessary personnel available to meet the Construction Schedule and to compensate for weather delays.

5.6     **Project Meetings**. Contractor shall attend all Project meetings called by Pulte.

5.7     **Project Manager**. At all times when the Work is in progress, Contractor shall have a qualified, experienced and knowledgeable project manager, superintendent or foreperson, readily available or on the Project jobsite as Contractor's representative for the Project who is able to communicate in English with Pulte and others on the jobsite and is authorized to represent Contractor as to all matters on the Project and to make such monetary and non-monetary decisions on behalf of Contractor as may be necessary for the prompt and efficient performance of this Agreement. Prior to the commencement of Work, Contractor shall notify Pulte of the identity of Contractor's representative on the Project jobsite and any replacement representative. Pulte may reasonably reject Contractor's representative and any replacements.

5.8     **Conduct**. While at any Pulte facility or a Project jobsite, Contractor, Contractor's employees and Contractor's Agents shall conduct themselves in a professional manner, shall comply with all Project jobsite rules and regulations adopted by Pulte, and shall comply with all of Pulte's reasonable requests regarding personal conduct.

5.9     **Project Rules and Applicable Laws**. In connection with all of its activities under this Agreement, Contractor shall comply with all rules, programs and processes initiated by Pulte for the Project and all Applicable Laws.

5.10    **OSHA Compliance**. Contractor acknowledges that the Occupational Safety and Health Act of 1970 (and any and all state and local laws related to occupational health and safety) (the **"OSHA Regulations"**), all as amended from time to time, require, among other things, all contractors and subcontractors to furnish to their workers employment and a

Nc Master Trade Agreement

place of employment that is free from recognized hazards. In this regard, Contractor specifically agrees, without limitation of its general obligations under Section 5.9, as follows:

      (a)    Contractor will fully comply with the OSHA Regulations then in effect during the performance of any Work and will cooperate with Pulte and all subcontractors of Pulte in order to assure compliance with the OSHA Regulations.

      (b)    Contractor accepts full responsibility and liability for the training of its employees as to all precautionary measures necessary to protect such employees during both routine and emergency situations on the Project jobsite and Contractor shall make available for Pulte's review all records and logs indicating such training was administered by Contractor to its employees.

      (c)    Contractor will assist Pulte in complying with the OSHA Regulations.

      (d)    Before using any chemicals in its performance of the Work for Pulte or incorporating any chemicals into Materials supplied to Pulte or to the Project jobsite, Contractor must give Pulte prior written notice of the existence and the possible exposure to such chemicals, and deliver a material safety data sheet to Pulte.

      (e)    Contractor will fully comply (and will cause its employees and Contractor's Agents to comply) with all Project jobsite rules or regulations, including those that relate to safety, that Pulte may put in place. Even though Pulte may put some safety-related rules and regulations in place, Contractor acknowledges that it continues to be responsible for the safety of its employees and Contractor's Agents and that Pulte assumes no responsibility or obligation for their safety.

    5.11    **OSHA Violations**. Pulte has entered into this Agreement with Contractor with the expectation that Contractor will perform Work on the Project jobsites fully in compliance with OSHA Regulations. Any failure by Contractor to do so could result in potential losses to Pulte (potential liability for injuries, administrative fines or penalties, operational costs due to work stoppages, etc.). Because of these potential losses, if Pulte identifies violations of OSHA Regulations or of the Project jobsite rules and regulations related to safety by Contractor (or its employees or Contractor's Agents), Contractor shall, in addition to and not in place of any and all other rights and remedies that Pulte may have under this Agreement, reimburse Pulte for all Costs. Pulte may offset or back-charge these Costs against amounts that may otherwise be due from Pulte to Contractor under this Agreement. Although Pulte has the right to do so, Pulte has no obligation to monitor compliance with OSHA Regulations by Contractor (and its employees and Contractor's Agents). Pulte's failure to assess Costs against Contractor as provided in this Section 5.11 shall in no way waive any of Pulte's rights and remedies available under this Agreement or otherwise. Furthermore, failure to comply with this Section is a default by Contractor, giving Pulte the right to exercise any remedies (including termination, penalties and fines) available under this Agreement.

    5.12    **Injuries**. Contractor shall immediately advise Pulte of any injury to any of Contractor's employees or Contractor's Agents at the jobsite, and will provide Pulte with a written report regarding such injury within 24 hours of such injury.

    5.13    **Clean Jobsite**. Contractor shall at all times keep all aspects of the Project jobsite, including any streets, alleys, sidewalks and storage areas, free from all Waste generated in connection with the Work, and remove all such Waste from the jobsite or deposit it in such locations as Pulte may from time to time designate. When practicable, all such Waste shall be compacted before disposal. The interior and exterior of all homes on a Project are to be clean at all times to allow Contractor and all other contractors and subcontractors of Pulte to perform their work efficiently and safe. Upon completion of the Work, Contractor shall promptly remove all such Waste and tools from the Project jobsite. Contractor shall leave the Project jobsite and adjacent areas thereto in "broom clean" condition at the end of each day. Contractor shall also move all excess usable Materials and/or spoils provided to Pulte by Contractor in accordance with instructions issued by Pulte. If Contractor fails to clean up as provided herein, Pulte has the right, but not the obligation, to do so and Pulte shall be entitled to reimbursement from Contractor for all Costs of such clean up. If a dispute arises among Contractor, other contractors and Pulte as to the responsibility for maintaining the Project jobsite and the surrounding area free from Waste, Pulte may clean up and Pulte will allocate the Costs among those responsible, as reasonably determined by Pulte. Pulte's allocation of Costs shall be binding on Contractor.

DocuSign Envelope ID: 9F11336B-2543-43ED-A3BC-FD542D6D9989

5.14 **Noise**. Contractor shall comply with all requirements of the local jurisdiction within which a Project is located relating to construction noise.

5.15 **Work Hours**. Unless otherwise specified by Pulte, construction, alteration, or repair activities which are authorized by a valid permit shall be allowed only during the hours permitted by the local jurisdiction in which the Project is located. On weekends and federal holidays, construction shall be allowed only as permitted by the local jurisdiction and any active homeowners' association rules.

5.16 **Blasting**. If blasting activities are required for the Work, Contractor shall conduct the blasting activities in compliance with all Applicable Laws. Contractor shall submit blasting plans for review and approval by the local jurisdiction prior to commencing any blasting activities.

5.17 **Excavation or Digging**. Contractor must verify that there is no conflict with the location of any utilities or landscaping prior to any excavation or digging. Contractor shall have all existing underground utilities located prior to excavation or digging. Contractor shall perform the Work so as to not damage utility lines, and shall follow all applicable encroachment standards affecting the utility rights of way and adequately protect its own employees, and those of others and Pulte, in performing the Work.

5.18 **Use of Utilities**. Contractor shall not use any utilities, except those specifically provided by Pulte. Current homeowners' utilities shall not be used except where approved by homeowner for the purpose of completing warranty work.

5.19 **Coordination of Work**. Contractor shall coordinate its Work with Pulte and other contractors and subcontractors of Pulte so that Contractor's performance of its Work will not interfere with or cause problems, defects or delays in the work being performed by Pulte and its other contractors and subcontractors.

5.20 **Failure to Prosecute the Work**. If Contractor should fail or refuse to prosecute the Work properly and diligently or fail to perform any provisions of this Agreement and should any such failure or refusal continue for 24 hours after oral or written notice to Contractor, then such failure shall constitute a breach of this Agreement. Such breach shall entitle Pulte to immediately terminate this Agreement or the applicable Work Order, and remedy the situation with all Costs being borne by Contractor.

5.21 **No Damages for Delays**. Pulte shall have no liability to Contractor if any other contractor fails to comply with its respective Construction Schedule thereby delaying the progress of the Work. Contractor expressly agrees not to make, and hereby waives, any and all monetary claims for damages against Pulte caused by any delay for any cause whatsoever, even those delays caused by Pulte or those delays for which Pulte may otherwise be liable. Contractor acknowledges that an extension of time shall be its sole and exclusive remedy in this regard. Should Contractor be delayed in the prosecution of any Work solely by the acts of Pulte or by a Force Majeure Event, the time allowed for completion of the Work shall be extended by the number of days that Contractor has been thus delayed, but no allowance or extension shall be made unless a claim therefor is presented in writing to Pulte immediately upon the onset of such delay.

5.22 **Shortage of Labor or Materials**. Contractor shall give Pulte immediate written notice if Contractor foresees, experiences or is advised of any constraint, shortage or insufficiency in the supply of any Materials, labor or other items necessary for Contractor to timely perform its obligations under this Agreement. The giving of such notice shall not excuse Contractor from its obligations hereunder. In the event of any such constraint, shortage or insufficiency, Contractor shall, at its own cost and expense, use its best efforts to promptly resolve any such constraint, shortage or insufficiency, including increasing its forces, working such overtime or expediting the delivery of Materials or other items as may be required to bring its Work into compliance with the Construction Schedule. Contractor shall provide Pulte with priority of supply and labor over any other customer of Contractor at no additional cost to Pulte. In the event that Contractor is unable to remedy a Material shortage under this Section 5.22, Pulte may, at its sole discretion, locate, order and take delivery of affected Materials directly from the manufacturer or an alternative supplier and Contractor shall reimburse Pulte for all Costs associated therewith.

5.23 **No Changes to the Work**. Contractor shall not make any changes in the Work (including additions, deletions or substitutions) or perform any additional Work without the prior written consent of Pulte. Contractor will not receive any sums in excess of the Work Price or any extension in the Construction Schedule without first obtaining such

Nc Master Trade Agreement

DocuSign Envelope ID: 9FTT336B-2343-43ED-A3BC-FD542D6D9969

prior written consent of Pulte. Any authorizations for changes in Work, including performance of additional Work, shall be subject to the terms of this Agreement and shall be upon such written forms as shall be provided by Pulte to Contractor.

## 6.    RECEIPT AND PROTECTION OF MATERIALS; PROTECTION OF WORK

6.1    **Take-offs**. Contractor and Pulte shall mutually agree upon Take-offs. After such mutual agreement, no adjustments in the Take-off shall be permitted without Pulte's prior express written consent. Contractor shall be responsible to obtain or procure any Materials necessary to complete the Work in excess of the quantities set forth in the Take-off at Contractor's own expense.

6.2    **Acceptance of Materials**. Contractor is responsible for accepting or rejecting all Materials. Contractor shall reject all Materials that do not conform to the Specifications. Contractor shall not install or use any damaged Materials.

6.3    **Risk of Loss**. All Materials delivered to and accepted by Contractor or transported by Contractor to and from the Project jobsite shall be at the sole risk and responsibility of Contractor.

6.4    **Protection of Materials and Work**. Contractor shall keep, store and maintain all Materials in good order and protect all Materials from damage, theft and loss. Contractor shall be solely responsible for the protection of and good condition of the Work until final completion thereof.

6.5    **Loss or Damage to Materials and Work**. Contractor shall protect the Work and all property adjacent to that upon which it is performing Work and the property, work and materials of other contractors and subcontractors from injury arising out of the Work. In no event shall Pulte be responsible for loss or damage to the Work proximately caused by the Contractor's breach of this Agreement or a Work Order, by a negligent, reckless, or intentional act of the Contractor constituting a tort under applicable statutes or common law, or by violations of any applicable statute or regulation, and Contractor shall indemnify and hold Pulte harmless from any such claims.

6.6    **Natural Disasters**. Without limiting the generality of the foregoing, Contractor shall take all precautions and actions that may be appropriate, whether or not requested by Pulte, to protect Materials and Work during predicted natural disasters, such as tornados, hurricanes, and severe thunderstorms.

6.7    **Damage, Theft, or Vandalism**. Contractor is solely responsible for its Materials, tools and equipment lost, damaged or stolen at the Project jobsite. Contractor shall be responsible for any defect in the Work or damages, theft or loss thereof caused by or resulting from its failure to adequately and properly protect the Work. Contractor shall be fully liable and responsible to Pulte for all Costs associated with any damage, loss, theft, or vandalism resulting from Contractor's failure to fully comply with the terms of this Section. Contractor acknowledges and agrees that Pulte owes no duty to protect the Work and if Pulte uses the services of any security guard that such services are for Pulte's exclusive benefit and that Contractor shall not rely upon such services.

## 7.    PRICES AND PAYMENT

7.1    **Work Price**. Contractor shall perform the Work for the Work Price.

7.2    **Payment Procedures**. Pulte shall designate the methodology for payment to Contractor.

(a)    If Contractor is instructed to submit invoices to Pulte, then Contractor will remit invoices, and Pulte will pay such invoices, in accordance with the terms of the applicable Work Order. Unless otherwise provided by Pulte in writing, then all amounts due Contractor for Work performed pursuant to this Agreement are due 30 days following the date of receipt by Pulte of Contractor's invoice. An invoice date shall be no earlier than the date the Work, or applicable portion thereof, is completed. All invoices must be submitted by Contractor within 30 days of its completion of the Work, or applicable portion thereof. Invoices received after 90 days of the completion of the Work, or applicable portion thereof, shall be null and void. Pulte shall not be liable for any charges associated with the Work represented by such delinquent invoices, and Contractor hereby expressly waives its right to receive any payment in connection with any such delinquent invoices.

Nc Master Trade Agreement

(b)     If Pulte manages payments to Contractor with an electronic payment system in lieu of invoices, payment to Contractor is due 30 days following sign-off from the designated Pulte Project superintendent of completed portion(s) of the Work.

7.3     **Notice of Nonpayment**. Contractor agrees to notify Pulte within 5 business days if Contractor has not received payment in full within 60 days of payment becoming due under Section (a) or (b) above. Failure to so notify all appropriate parties will result in Contractor forfeiting money due for such completed Work.

7.4     **Additional Documentation**. As a condition to any payment to be made by Pulte to Contractor, Pulte may, at its option, require Contractor to furnish to Pulte: (a) full and complete Lien waivers, in a form acceptable to Pulte, executed by Contractor and all Contractor's Agents, as well as any other information and documentation requested by Pulte, with respect to the Work covered by the applicable invoice; and (b) a current sworn statement from Contractor attesting to the identity of all Contractor's Agents, the amount of each subcontract or contract with Contractor's Agents, the amount requested for any Contractor's Agent in the applicable invoice, the amount Contractor has paid to each Contractor's Agent, and the amount to be paid Contractor under the invoice.

7.5     **No Waiver**. Payment under any Work Order is not evidence of performance of Contractor's obligations under this Agreement, either in whole or in part, and payment does not constitute acceptance of defective Work.

7.6     **Retainage**. Subject to Applicable Laws, Pulte may retain up to 10% from amounts owing to Contractor under a Work Order. Such retainage may be retained by Pulte as long as permitted by Applicable Laws. In the event that no Applicable Laws govern, Pulte may retain the retainage for such period of time during which a Lien or claim of Lien could lawfully be filed by anyone related to the applicable Work Order.

7.7     **Set-offs**. Contractor agrees that amounts owed under any Work Order are subject to offsets by Pulte in the event of: (a) Contractor's breaches of this Agreement; (b) any damages caused by Contractor; (c) any Liens, Costs or other claims arising out of the Work; (d) any Costs of curing defective Work or completing unfinished Work; (e) Contractor's breaches of other agreements between Contractor and Pulte; or (f) claims or amounts due to Pulte regardless of whether they arise out of this Agreement. If Pulte terminates any Work Order as a result of Contractor's failure to comply with the terms and conditions of the Work Order or this Agreement, then Pulte shall have the right to terminate any other agreements between Contractor and Pulte.

7.8     **Effect of Contractor's Breach**. If Contractor breaches this Agreement, Pulte may stop all payments to Contractor until such time as Pulte ascertains its Costs resulting from the breach, at which time Pulte is authorized to deduct all Costs related thereto from any monies owed Contractor.

7.9     **Disputed Payments**. Contractor shall not delay or stop any Work by reason of Pulte's failure to make any payments if the failure is a result of a dispute as to the amount of the payment or whether payment is due.

8.     **LIENS; WAIVER OF LIENS**

8.1     **No Liens**. Contractor shall pay when due, all claims for labor, equipment and Materials furnished to the Project as part of the Work, and all claims made by any benefit trust fund pursuant to any collective bargaining agreement to which Contractor may be bound, to prevent the filing of any Liens involving the Work, the Project or Contractor. Contractor shall within 5 days after notice take whatever action is necessary to terminate the effect of any Liens, including filing or recording a release or lien bond.

8.2     **Failure to Remove Liens**. Contractor's failure to comply with the requirements of Section 8.1 within a period of 5 days after notice from Pulte of any Liens shall entitle Pulte to terminate the applicable Work Order or this Agreement or both. In addition, Pulte may use whatever means it may deem best to cause the Liens, together with their effect upon the title of the Project, to be removed, discharged, compromised or dismissed, including making payment of the full amount claimed, and the Costs thereof shall become immediately due and payable by Contractor to Pulte.

8.3     **Pulte May Withhold Payment to Contractor**. If Pulte receives notice of any failure to pay or notice of Liens (or intent to Lien) pertaining to Contractor, Contractor's Agents or the Work, Pulte may withhold the payment of any

Nc Master Trade Agreement

monies to which Contractor would otherwise be entitled to receive, until such time that Pulte has reasonable evidence that such Liens have been discharged.

8.4  **Direct or Joint Payments**. If Contractor fails to pay and discharge when due any monetary obligations of any kind or nature whatsoever incurred by Contractor by reason or in the fulfillment of this Agreement, whether or not Liens have been or may be issued or filed with respect thereto, which monetary obligations in the opinion of Pulte are proper, Pulte may pay all or any part of such monetary obligations for Contractor's account or Pulte may issue payment jointly to Contractor and the applicable third party. Pulte has no obligation to make any such direct or joint payment and whether it chooses to make any such payment is solely at the discretion of Pulte. Any such payment made by Pulte shall constitute a payment to Contractor under this Agreement. Contractor hereby expressly waives and releases any claim against or right of recovery from Pulte by reason of any act or omission of Pulte in making any such payment and nothing herein shall be deemed to mean Pulte assumes any liability towards Contractor's Agents.

8.5  **Payment of Costs**. Contractor shall pay to Pulte upon demand all Costs in connection with the discharge and release of any Lien.

8.6  **Waiver of Lien Rights**. Contractor intends to furnish Work in the construction, repair or replacement of improvements upon real property owned or to be owned by Pulte.

(a)  Contractor shall not assign any claim for payment or any right to perfect a Lien against Work, real property, or the improvements thereon, to any third person. Any such attempted assignment shall be invalid and not enforceable and shall be deemed a breach of Contractor's obligations under this Agreement. Contractor shall include substantially identical language to this Section 8.6(a) in all subcontracts for Work.

(b)  In addition to any notices required by Applicable Law, Contractor shall provide Pulte with written notice at least 10 business days before placing or filing any Lien against any real property upon which Work is performed.

**PULTE HEREBY NOTIFIES CONTRACTOR AND CONTRACTOR ACKNOWLEDGES THAT PULTE HAS DESIGNATED PREMIER AS ITS LIEN AGENT PURSUANT TO APPLICABLE LAW AND PREMIER'S CONTACT INFORMATION IS LISTED ABOVE.**

## 9.  QUALITY, INSPECTION AND CORRECTION OF WORK

9.1  **Quality of the Work**. Contractor shall perform the Work in a good and workmanlike manner, free of defects, in compliance with this Agreement, Applicable Laws, and all manufacturer's recommendations, installation guidelines and specifications, and to the satisfaction of Pulte. All Work shall meet or exceed the highest standards of the industry for residential construction in the same geographic area.

9.2  **Inspection of the Work**. Pulte shall inspect the Work for quality and completion. Contractor shall schedule all inspections relative to the Work and shall perform any tests necessary to receive inspection approval. Pulte may hire third party inspectors and Contractor shall cooperate with such inspectors and make corrective Work they require, at no additional cost to Pulte.

9.3  **Correction of Deficiencies or Defects**. Contractor shall promptly correct all Work which Pulte deems deficient, defective or nonconforming. Contractor shall bear all costs of correcting such rejected Work without any increase in the Work Price. Pulte may nullify any previous approval of Work if it subsequently determines that the Work is defective or non-compliant with the Work Order. Contractor shall, within 1 business day after receiving notice from Pulte, take down all portions of the Work and remove from the grounds and buildings all Materials, which Pulte rejects as unsound or improper, and Contractor shall repair or replace all Work rejected at Contractor's sole expense.

9.4  **Pulte's Rights**. If Pulte exercises any of its options, remedies or rights under the terms of this Agreement in the event of any material failure of performance or breach by Contractor, Pulte may: (a) use any Materials on the Project jobsite, which belong to Contractor, to complete the Work, whether such Work is completed by Pulte or others, and Contractor agrees that it shall not remove such Materials from the Project jobsite unless directed in writing by Pulte to do so; (b) eject Contractor from the Project jobsite; and (c) enforce any or all of Contractor's contracts with Contractor's

Agents, true and complete copies of which (including all modifications and change orders) shall be provided by Contractor immediately upon Pulte's request. In exercising its rights under Section 9.4(c), Pulte shall only be acting as the authorized agent of Contractor and Pulte shall not incur any independent obligation in connection therewith.

## 10. WARRANTIES; WARRANTY WORK AND PERFORMANCE STANDARDS

10.1 **Materials and Work**. Contractor warrants and guarantees that: (a) all Materials, except materials provided by Pulte, shall meet or exceed the requirements of this Agreement, all Applicable Laws and shall be new, of good quality and free of Liens, security interests, claims or encumbrances; and (b) all Work shall meet or exceed the requirements of all Applicable Laws.

10.2 **Warranty**. Contractor warrants that the Work shall be and remain free from defects or flaws for the Warranty Period. Upon Pulte's acceptance of the Work, Contractor shall deliver and transfer to Pulte any and all manufacturer's warranties for Materials. The warranties and guarantees contained herein shall in all cases survive termination of this Agreement and shall apply to both patent and latent defects in workmanship and materials.

10.3 **Warranty Work and Performance Standards**. If, during the applicable Warranty Period, the Work does not comply with the warranties set forth in this Agreement, then Contractor shall promptly repair or replace the Work at Contractor's sole cost and expense, within 48 hours after notice to do so, or within 3 hours after notice in the event of any emergency. Pulte shall determine whether an emergency exists, which generally includes those conditions involving the risk of harm to persons or property or which make the home not habitable comfortably. Repairs and replacements shall be made in a diligent first-class manner with as little inconvenience as possible to Pulte and the homeowner. Contractor shall clean up thoroughly after repairs are completed. Neither repairs nor replacements shall be deemed to be complete until the defect or non-conformity has been permanently corrected. Contractor shall reimburse Pulte (or at Pulte's direction, the homeowner) for any damages to the home, for any damages to the personal property located at the home, and for any reasonable Costs incurred as a result of the inconvenience or loss of use and enjoyment of the home which is caused by the defect, non-conformity or the repairs or replacements. If Contractor fails or refuses to timely fulfill any of its warranty obligations, Pulte may repair or replace the applicable Work and Contractor shall reimburse and pay Pulte for all Costs related thereto.

10.4 **Repairs After Expiration of the Warranty**. If the Work is determined by Pulte to be defective or otherwise non-conforming after the expiration of the Warranty Period but before the expiration of the applicable statute of limitations or repose, Contractor shall, upon request from Pulte, repair and replace such Work. Contractor shall use commercially reasonable efforts to promptly perform such repair and replacement at Contractor's sole cost and expense. If Contractor performs any such repair or replacement after the expiration of the Warranty Period and after the expiration of the applicable statute of limitations or repose, Pulte shall compensate Contractor for such repair or replacement activities at reasonable market rates. The provisions of this Section shall survive expiration or termination of this Agreement or completion of the Work.

10.5 **Notice and Opportunity to Repair Statutes**. Contractor shall cooperate with Pulte in connection with any matters relating to any applicable notice and opportunity to repair statutes. If Contractor fails or refuses to cooperate in that process, Pulte will have the right to correct any defective Work and damage caused as a result of such defective work, and Contractor shall, upon demand, immediately reimburse Pulte for all Costs incurred responding to such matters and performing all such repairs.

## 11. GENERAL ENVIRONMENTAL COMPLIANCE

11.1 **Compliance with Applicable Laws**. Contractor and Contractor's Agents shall fully comply with all Applicable Laws regarding the environment and natural resources.

11.2 **Storage of Materials**. Contractor is solely responsible for the proper use, storage and handling of all Materials, including potential pollutants, used in the Work, and for the generation, handling and disposal of all Waste resulting from the Work, in full compliance with all Applicable Laws regarding the environment and natural resources. In addition, Contractor shall immediately notify Pulte if Contractor or Contractor's Agents generate more than 100 kilograms of hazardous waste in any one month on a Project site.

11.3 **Impacts to Wetlands and Waters**. Contractor and Contractor's Agents shall not (i) cause any unpermitted impacts to wetlands, waters, habitats or designated protected areas, or (ii) violate any permits governing such matters or issued in connection therewith.

11.4 **Vehicles and Equipment**. Contractor and Contractor's Agents shall minimize any vehicle or equipment fueling, washing, maintenance or repair on a Project jobsite and any such activities shall not result in run-off or releases onto the ground or off a Project jobsite or into a storm water management or conveyance system.

11.5 **Remediation**. Contractor will take immediate steps, at Contractor's sole expense, to cause to be remediated in full compliance with and to the full extent required by the Applicable Laws, any release or discharge by Contractor of any hazardous or other regulated substance on or from a Project jobsite.

11.6 **Failure to Correct Non-Compliance**. If Contractor fails to correct any non-compliance with this Section after written notice from Pulte, Pulte may, without assuming any liability therefor, correct such non-compliance and charge the Costs to Contractor.

12. **STORMWATER MANAGEMENT**

12.1 **Compliance with Stormwater Applicable Laws**. Contractor shall fully comply with all Stormwater Applicable Laws, Project NPDES Permit(s), and the Project SWPPP.

12.2 **Contractor's Representative**. Contractor shall designate a Contractor employee representative with authority from Contractor to oversee, instruct, and direct Contractor's employees and Contractor's Agents regarding compliance with the requirements of the Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP. Prior to commencing Work, the designated Contractor representative shall contact Pulte's jobsite stormwater representative to request information on stormwater management at the Project. Contractor and Contractor's Agents shall review prior to commencing Work on the jobsite, and shall abide by at all times, (i) all stormwater and jobsite orientation materials and direction provided by Pulte to Contractor, and as may be required by the Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP, and (ii) file all notifications, plans and forms required by Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP. Contractor is responsible for circulating information provided by Pulte regarding stormwater management to its employees and Contractor's Agents who will be working on the Project.

12.3 **Compliance with SWPPP**. Contractor shall require Contractor's Agents to immediately notify Contractor and Pulte of any source pollutants that Contractor's Agents intend to use on the jobsite that are not identified in the Project SWPPP, and require that each of Contractor's Agents on the Project immediately notify Contractor and Pulte of any corrections or recommended changes to the Project SWPPP that would reduce or eliminate the discharge of pollutants and/or sediments from the jobsite. Further, neither Contractor nor any of Contractor's Agents shall discharge any prohibited non-stormwater discharges to stormwater systems or from the jobsite. If requested by Pulte, Contractor shall annually or at the completion of the Work, certify that the Work was performed in compliance with the requirements of the Stormwater Applicable Laws, Project NPDES Permit(s), and Project SWPPP.

12.4 **Best Management Practices**. Contractor acknowledges that periodic changes may have to be made to the Project SWPPP during the progress of the Work, and Contractor shall at all times comply with, and require that Contractor's Agents at all times comply with, the most current version of the Project SWPPP. Contractor and Contractor's Agents shall use best efforts to comply with the Project SWPPP practices and procedures, including the "best management practices," and Contractor shall implement "best management practices" to control erosion and sedimentation and to prevent the discharge of pollutants. Contractor shall ensure that all of Contractor's and Contractor's Agent's personnel are appropriately trained in the appropriate "best management practices", and trained to comply with the Project SWPPP, Project NPDES Permit(s), and Stormwater Applicable Laws.

12.5 **Notice of Discharge**. Contractor shall immediately notify Pulte if it observes, discovers and/or becomes aware of (i) any spill of any hazardous or toxic substance or material or other pollutants on the jobsite, (ii) any discharge of any hazardous or toxic substance or material or other pollutants into or on the jobsite which leaves the jobsite or is capable of being washed from the jobsite during a rain event, (iii) any failure by any party to comply with the requirements of the Project SWPPP, Project NPDES Permit(s), and Stormwater Applicable Laws, and (iv) any damage to or failure of a "best

management practice" or any other stormwater and erosion and sediment control measure. Contractor shall retain all records relating to the Project SWPPP, Project NPDES Permit(s), and Stormwater Applicable Laws, and any and all violations of the same, for a period of three (3) years following completion of the Project, or longer as required by applicable law.

12.6    **Pulte's Right to Remediate**. Notwithstanding anything to the contrary contained herein, Pulte shall have the right, but not the obligation, to immediately remedy any violation of Stormwater Applicable Laws, Project NPDES Permit(s), and the Project SWPPP for which Contractor is responsible, without the necessity of providing Contractor with any notice or right to cure. Should Pulte remedy any such violation, Pulte shall have the right to back-charge Contractor for the Costs to remedy the violation. Conversely, Pulte shall have the right, in Pulte's sole and absolute discretion, to require Contractor to reimburse Pulte for the Costs incurred by Pulte to remedy such violation and/or for fines or penalties paid for such violation, and unless Contractor reimburses Pulte for such Costs within ten (10) days after receiving Pulte's written request for payment of the same, Contractor will be in default of this Agreement, and Pulte shall have all rights and remedies available to Pulte as a result of a Contractor default. Nothing in this Section shall limit or modify in any way Contractor's obligations or Pulte's rights under other provisions in this Agreement.

## 13.    **LABOR MATTERS**

13.1    **Not Pulte Employees**. Contractor acknowledges that (i) Contractor, its agents, its employees, or any individual who performs work for or at the request of Contractor is not an employee of Pulte and (ii) Pulte does not govern and is not responsible for any aspect of the employment relationship between Contractor and its employees.

13.2    **Contractor's Employees**. Contractor may recruit, interview, select, and hire individuals who, in Contractor's judgment, are best qualified to perform the Work. At Pulte's request, Contractor shall remove from the Project jobsite any employee who violates any Applicable Laws, makes threats or presents a potential danger to others at the Project jobsite, or improperly interferes with other work being performed at the Project jobsite, provided that this arrangement shall in no way affect the right of Contractor, in its sole discretion, to hire, assign, reassign and/or terminate its employees, contractors and subcontractors. In connection with performance of the Work, Contractor shall:

(a)    comply with any and all applicable federal, state and local equal employment opportunity/non-discrimination/anti-harassment laws and regulations including those precluding discrimination or harassment against any employee or applicant for employment because of race, color, sex, age, national origin, disability and/or any other protected class or status required by law;

(b)    calculate, pay, and record wages and overtime of its employees in full compliance with the Fair Labor Standards Act, which prescribes standards for wages and overtime pay, and all other Applicable Laws. Contractor must seek legal advice and/or contact the U.S Department of Labor at 1-866-4-USA-DOL (1-866-487-2365) or applicable state governmental entity if it has any questions regarding wage and hour compliance;

(c)    calculate and pay all fringe or other benefit payment or contribution, including interest thereon, owed to Contractor's employees or third parties on behalf of Contractor's employees;

(d)    calculate, pay or withhold all required employment related taxes, including payroll taxes, insurance premiums and other government mandated charges for Contractor's employees;

(e)    maintain personnel, payroll, and timekeeping records for its employees;

(f)    ensure that all employees are properly classified under Applicable Laws and that any individuals retained as independent contractors are properly classified as such under Applicable Laws; and

(g)    comply with the Immigration Reform and Control Act of 1986 (**"IRCA"**), and warrant that all employees of Contractor used to provide work or services to Pulte were hired in compliance with IRCA and all other

Applicable Laws concerning the employment and verification of individuals authorized to work in the United States (including timely I-9 verification).

13.3 **Labor Harmony**. Contractor shall maintain labor harmony on the Project jobsite, and shall not employ any persons, means, Materials or equipment which may cause strikes, work stoppages or any disturbances of Contractor's Agents, Pulte or any other contractor or subcontractor on the Project. Contractor shall perform Work with labor that is compatible with that of other trades performing work at the Project jobsite, and Contractor shall exercise all due diligence to overcome any strike or other labor dispute or action.

13.4 **Eligible to Work Legally in the United States**. Contractor is solely responsible for the verification of each of its employee's and Contractor's Agent's eligibility to work legally in the United States. Contractor represents and warrants that: (a) Contractor's employees and Contractor's Agents shall all be eligible to work legally in the United States; (b) Contractor will timely obtain, review and retain all documentation required by all Applicable Laws to ensure that each of its employees and each of Contractor's Agents is eligible to work legally in the United States; (c) Contractor shall comply with all Applicable Laws and other governmentally required procedures and requirements with respect to work eligibility, including all verifications and affirmation requirements; and (d) Contractor shall not knowingly or negligently hire, use, or permit to be hired or used, any person not eligible to work legally in the United States in the performance of the Work.

13.5 **Compliance with Employment Laws**. Contractor understands and agrees that Contractor's compliance with all employment laws is very important to Pulte and is a condition to maintaining its relationship with Pulte. Contractor must immediately inform Pulte if it is audited or investigated by any government body or any employment related lawsuit is filed against it.

## 14. RELATIONSHIP MANAGEMENT

14.1 **Cooperation**. Each party shall reasonably cooperate with the other party in connection with its obligations under this Agreement. Such cooperation shall include informing the other party of all management decisions that the party reasonably expects to have a material effect on the obligations required to be performed by that party under this Agreement.

14.2 **Communication**. Contractor shall maintain electronic communications with Pulte via e-mail or the Internet, and shall establish and maintain such other commercial communication methods and technical systems as Pulte may require from time to time.

14.3 **Verification of Performance of Obligations**. Contractor shall provide Pulte with all reports, documentation and information as Pulte reasonably requests to verify the performance of Contractor's obligations under this Agreement, including full reports of the progress of Work in such detail as may be required by Pulte including any shop drawings, as-built drawings and diagrams in the course of preparation, process, fabrication, manufacture, installation or treatment of the Work.

14.4 **Conduct of Contractor**. Contractor represents and warrants that it: (a) shall perform its obligations and deal with Pulte in good faith and with fair dealing; (b) shall conduct its business in a manner which reflects favorably on Pulte; (c) shall not engage in any deceptive, misleading, illegal or unethical business practices; (d) has not and shall not, directly or indirectly, request, induce, solicit, give or accept any bribe, kickback, illegal payment or excessive gifts or favors to or from Pulte or any Pulte employee, or any third party acting on Pulte's behalf; and (e) has not engaged in and shall not engage in any anticompetitive behavior, price fixing or any other unlawful restraints of trade. Contractor shall immediately provide written notice to Pulte of any of the foregoing upon Contractor's becoming aware of the same.

14.5 **Notice of Litigation or Investigation**. To the extent permissible under Applicable Law or agreement, Contractor shall notify Pulte in writing promptly of: (a) any litigation or arbitration brought against Contractor related to the Work; (b) any actions taken or investigations initiated by any governmental agency in connection with the Work; (c) any legal actions initiated against Contractor by governmental agencies or individuals regarding any illegal activities, including fraud, abuse, false claims or kickbacks; (d) any proceedings by or against Contractor in bankruptcy, insolvency of Contractor, any proceedings for appointment of a receiver or trustee or an assignment for the benefit of creditors or any other similar event. At Pulte's request, and to the extent permissible under Applicable Law or agreement, Contractor shall provide to Pulte all known details of the nature, circumstances, and disposition of any of the foregoing.

DocuSign Envelope ID: 91113356B-2343-43ED-A3BC-FD542D6D9969

## 15. GOALS, CONTINUOUS IMPROVEMENT AND QUALITY

15.1 **Cooperation**. Contractor acknowledges that Pulte's long term goals may include: (a) shortening build-times for the Projects; (b) increasing flexibility; (c) achieving ongoing cost reductions; and (d) achieving specific quality goals and continuous quality improvement. Contractor agrees to cooperate with Pulte in working toward achieving these goals, which includes the obligations set forth in this Section. At least once each contract year at Pulte's request, the parties shall meet to review Contractor's competitiveness regarding pricing, quality, technology and services, with a view to assuring they remain competitive with other contractors in the marketplace.

15.2 **Improvements in Performance of Work**. Contractor understands that Pulte's selection of Contractor as a provider of Work is based in part on Pulte's belief that Contractor is committed to continuing to improve its performance of Work and to find cost savings over the term of this Agreement. Savings may relate to development and implementation of manufacturing efficiencies, feature improvements, component purchase price reductions, engineering breakthroughs or delivery and distribution enhancements that result in lower cost of Work or operating expenses for Contractor or Pulte. To this end, Contractor shall use commercially reasonable efforts to continuously improve the performance and quality of Work, to assist Pulte in achieving costs savings associated with Work, and to reduce Contractor's costs of performing Work, through increases in efficiency and otherwise.

15.3 **Corrective Action Plan**. If Contractor fails to perform Work properly, Contractor shall promptly put into place a written corrective action plan, reasonably acceptable to Pulte, designed to ensure that Contractor will perform Work properly going forward.

## 16. INSPECTIONS AND REVIEWS

16.1 **Review of Books and Records**. At Pulte's request, Contractor shall allow Pulte or its designated representatives to review Contractor's applicable invoices, books and records to the extent necessary to verify Contractor's representations and charges to Pulte and compliance with this Agreement. Contractor shall reasonably cooperate with Pulte or its designated representatives in connection with such review. Upon completion of any such review, Pulte and Contractor shall review the report together and work in good faith to agree upon any adjustment of charges (including any reimbursement of overpayments) resulting from the review.

16.2 **Inspections**. Pulte and its agents shall have the right to inspect all Materials, facilities, Project jobsites and surrounding areas, to confirm Contractor's compliance with the requirements of this Agreement, including OSHA compliance. No inspection or failure to inspect by or on behalf of Pulte will increase Pulte's obligations or liabilities nor limit Pulte's rights or Contractor's obligations.

## 17. INDEMNIFICATION

17.1 **Indemnity**. To the extent permitted by law, Contractor hereby releases, covenants not to sue, and shall indemnify, defend and hold harmless Indemnitees from and against any and all Claims proximately caused by: (a) the performance or nonperformance of the Work, (b) defects in the Materials, (c) Contractor's or Contractor's Agents' failure to comply with the Stormwater Applicable Laws, NPDES Permit(s), or the Project SWPPP, (d) Contractor's or Contractor's Agents' failure to comply with the Fair Labor Standards Act, IRCA, or any other Applicable Laws concerning labor or employment, or (e) any other breach of this Agreement.

17.2 **Statutory Limits Inapplicable**. In any and all Claims against any Indemnitee brought by Contractor or Contractor's Agents, the indemnification obligation hereunder shall not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable by or for Contractor or Contractor's Agents under workers' or workman's compensation acts, disability benefit acts or other employee benefit acts.

17.3 **Indemnification and Defense Obligations**. Contractor's indemnification and defense obligations shall not be limited by the amounts or types of insurance that Contractor is required to carry under this Agreement or that Contractor does in fact carry.

17.4 **Homeowner Claims**. In the event any Indemnitee is required to mediate or arbitrate a Claim with a homeowner arising out of or relating to Work, an Indemnitee may, in its sole discretion, require Contractor to participate in

the mediation and/or arbitration in accordance with the Federal Arbitration Act, and pursuant to the applicable rules of the American Arbitration Association (or other applicable arbitration rules) as determined by Pulte's contract with the homeowner and/or any limited warranty provided to the homeowner. Any award rendered by the arbitrator may be confirmed, entered and enforced in any court having jurisdiction and Contractor and the Indemnitee(s) shall be bound by that decision.

17.5 **Survival**. The provisions of this Section 17 shall survive expiration or termination of this Agreement or completion of the Work and shall continue until such time it is determined by final judgment that the Claim against Indemnitees is fully and finally barred by the statute of limitations. The indemnification obligations shall not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which otherwise exists in favor of Pulte or any Indemnitee.

17.6 **Compliance with Law**. Pulte and Contractor agree that the indemnification obligations of Contractor set forth in this Agreement are intended to comply with N.C. G.S. 22B-1 (the "**Statute**"). In the event of a conflict or inconsistency between such indemnification obligations and the Statute, the terms and conditions of the Statute shall control to the extent of such conflict or inconsistency.

**18. INSURANCE.** Contractor shall carry, with insurance companies rated A- VII or better by A.M. Best Company, the following insurance coverage continuously during the life of this Agreement, and thereafter as provided below:

18.1 **Commercial General Liability Coverage**.

(a) Commercial General Liability Insurance (**"CGL"**) coverage shall be on an occurrence form containing limits of at least $1,000,000.00 per occurrence/$1,000,000.00 general aggregate/$1,000,000.00 products-completed operations, protecting against property damage, bodily injury and personal injury claims arising from the exposures of:

      (i) Premises or ongoing operations;

      (ii) Products-completed operations, which shall:

          (A) cover materials designed, furnished and/or modified in any way by Contractor;

          (B) have a separate aggregate limit at least equal to the CGL per occurrence limit; and

          (C) be maintained through the longer of the statute of limitations or repose period for construction defect and products liability claims in the state where the Work is performed. Policies and/or endorsements cannot include any provisions that terminate products-completed operations coverage at the end of a policy period or limit the coverage in any other way with respect to additional insureds;

      (iii) Independent contractors;

      (iv) Contractual liability; and

      (v) Property damage resulting from explosion, collapse, or underground (x, c, u) exposures (if applicable).

(b) The CGL coverage must be primary. Any of Pulte's insurance shall be considered excess for the purpose of responding to claims. The following wording must be included in the Description of Operations on the Certificate of Insurance: "This insurance is Primary and Non-Contributory."

(c) Contractor's CGL policy includes a waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates, by referencing and attaching the required endorsement.

(d) The policy shall not contain exclusions for the Work, including exclusions for residential construction, attached product (if applicable), liability that arises from a dispute governed by a notice and opportunity to repair statute, or any Contractor's Agent's Work or injuries to its employees or agents (if Contractor subcontracts any portion

16 of 23

of the Work). For attached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction, condominiums, multi-family, or multi-unit dwelling." For detached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction."

      (e)      PulteGroup, Inc., its subsidiaries and affiliates, shall be named as additional insureds on the CGL policy by having the insurance carrier issue an additional insured endorsement(s) at least as broad as the ISO CG 2010 11/85 Additional Insured - Owners, Lessees or Contractors - Form B endorsement. Such additional insured status under the CGL policy shall not be limited by amendatory language to the policy. Further, this endorsement shall:

            (i)      Provide coverage for both premises/ongoing operations **and** products-completed operations to the benefit of the additional insured; and

            (ii)      Provide coverage to the full extent of the actual limits of Contractor's coverage even if such actual limits exceed the minimum limits required by this Agreement.

      (f)      Owners and Contractors Protective Liability Policies **cannot fulfill the requirement for CGL coverage** under this Agreement.

      (g)      In the event that Contractor opts to participate in any alternative general liability insurance program offered through Pulte as a means to fulfill the requirement for CGL coverage, Contractor agrees that Pulte may deduct premium payments due Contractor under this Agreement.

      (h)      In the event that Contractor provides Work for a Project covered by an Owner Controlled Insurance Program arranged by Pulte, the CGL requirements are hereby waived for purposes of that Project only.

    18.2    **Automobile Liability Coverage**. Contractor shall carry automobile liability coverage with a combined single limit of $1,000,000 insuring against bodily injury and/or property damage arising out of the operation, maintenance, use, loading or unloading of any auto including owned, non-owned, and hired autos. PulteGroup, Inc., its subsidiaries and affiliates, shall be named as additional insureds on the automobile liability policy.

    18.3    **Workers' Compensation and Employer's Liability Coverage**.

      (a)      Contractor shall carry workers' compensation insurance providing statutory benefits imposed by applicable state or federal law such that: (1) Pulte shall have no liability to Contractor, its employees or Contractor's Agents; and (2) Contractor shall satisfy all workers' compensation obligations imposed by state law.

      (b)      This policy shall include a **documented** waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates (in states where permitted).

      (c)      If any of Contractor's employees or Contractor's Agents are subject to the rights and obligations of the Longshoremen and Harbor Workers Act or any other maritime law or act, the workers' compensation insurance must be broadened to provide additional required coverage.

      (d)      For purposes of worker's compensation coverage, Contractor agrees that Contractor, Contractor's employees and Contractor's Agents are not employees of Pulte, and are therefore not beneficiaries of any Pulte coverage.

      (e)      Contractor may satisfy its workers' compensation obligations by providing documentation of current authorization from the appropriate state authorities for the state(s) where the Work is performed indicating that Contractor is adequately self-insured for workers' compensation claims.

      (f)      Contractor shall carry employer's liability coverage with limits of not less than:

            (i)      $500,000      Each Accident

            (ii)      $500,000      Aggregate Policy Limit for Disease

            (iii)      $500,000      Each Employee

Nc Master Trade Agreement

18.4 **Pollution Liability Insurance**. Contractor shall carry the insurance required under this Section 18.4 if any of the Work involves demolition; disturbing or otherwise handling asbestos containing materials; lead based paint, pollutants or hazardous or toxic materials; mold remediation or similar environmental scopes of work.

(a) Contractor shall carry Pollution Liability insurance ("PL") coverage with limits of at least $5,000,000.00 per occurrence and in the aggregate insuring against losses for Clean-up, Bodily Injury, Property Damage or Natural Resource Damage that Contractor becomes liable to pay to a third party, including local, state or federal government, for a pollution release, including contaminants associated with asbestos, lead based paint, PCB's or other pollution conditions, arising from Work performed at a Project.

(b) The PL policy shall include coverage for loss due to loading, transporting or unloading of asbestos, lead-based paint or other products or hazardous or toxic substance or material performed by or on behalf of Contractor or Pulte.

(c) If PL coverage is carried on a claims made basis, the policy limits must be at least $5,000,000.00 per claim and in the aggregate, or limit carried, whichever is greater, and the PL policy must be in effect as of the date of commencement of performance of the Work and be maintained for a minimum of three (3) years thereafter.

(d) PulteGroup, Inc., its subsidiaries and affiliates, shall be named as additional insureds on the PL policy.

18.5 **Umbrella or Excess Coverage.** To the extent Contractor carries umbrella or excess insurance above the minimum required limits stated in this Agreement, the protection afforded the additional insureds in the umbrella or excess liability insurance shall be as broad or broader, than the coverage in the underlying insurance and in accordance with this Agreement. Each umbrella or excess liability policy shall specifically state that the insurance provided by Contractor shall be considered primary.

18.6 **Deductibles**. Contractor shall disclose all applicable policy deductibles and/or self-insured retentions ("**SIR**") and be liable for all costs within the deductibles and/or SIR.

18.7 **Certificates of Insurance**. Prior to commencement of the Work, Contractor shall evidence that such insurance is in force by furnishing Pulte with a certificate of insurance, or if requested by Pulte, certified copies of the policies. Notwithstanding the non-renewal or termination of this Agreement, Contractor shall provide renewal certificates and endorsements to Pulte for so long as the applicable insurance is required to be maintained pursuant to this Section 18. Renewal certificates shall be provided at least 10 days prior to expiration of the policy. The certificate shall evidence the requirements of this Agreement and specify that:

(a) PulteGroup, Inc., its subsidiaries and affiliates, are additional insureds on the CGL and automobile policies, and if applicable the umbrella and/or excess policies, by referencing and attaching the required endorsement;

(b) The policy does not contain exclusions for the Work and/or for duties performed by Contractor pursuant to this Agreement, including residential construction, attached product (if applicable), or liability that arises from a dispute governed by a notice and opportunity to repair statute. For attached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction, condominiums, multi-family, or multi-unit dwelling." For detached product, the following wording must be included in the Description of Operations on the Certificate of Insurance: "No exclusionary language or limitations relating to residential construction."

(c) Contractor's coverage is primary and Pulte's insurance is excess for any Claims. The following wording must be included in the Description of Operations on the Certificate of Insurance: "This insurance is Primary and Non-Contributory;"

(d) Contractor's CGL policy contains contractual liability coverage;

Nc Master Trade Agreement

(e)     Contractor's workers' compensation policy includes a waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates (in states where permitted), by referencing and attaching the required endorsement;

(f)     Contractor's CGL policy includes a waiver of subrogation in favor of PulteGroup, Inc., its subsidiaries and affiliates, by referencing and attaching the required endorsement; and

(g)     Contractor must provide evidence of workers compensation in the states(s) that it operates by either listing on the certificate those states listed in item 3.A. of the Information Page of the workers compensation Policy or attaching a copy of the Information Page.

18.8    **Contractor's Agent(s)**.

(a)     If Contractor subcontracts any portion of the Work, Contractor shall nevertheless be bound to indemnify Indemnitees as provided in this Agreement on behalf of Contractor's Agent(s). Contractor shall require that Contractor's Agent(s) indemnify Indemnitees as provided in this Agreement and carry insurance as set forth in this Agreement prior to permitting Contractor's Agent(s) to commence such portion of the Work.

(b)     Contractor shall require in its purchase orders that its suppliers indemnify Contractor and Indemnitees from all claims arising from any Materials included in any Work.

18.9    **Modifications**.

(a)     Any attempt by Contractor to cancel or modify insurance coverage required by this Agreement, or any failure by Contractor to maintain such coverage, shall be a default under this Agreement and, upon such default, Pulte will have the right to immediately terminate this Agreement and/or exercise any of its rights at law or at equity. In addition to any other remedies, Pulte may, at its discretion, withhold payment of any sums due under this Agreement until Contractor provides adequate proof of insurance.

(b)     The amounts and types of insurance set forth above are minimums required by Pulte and shall not substitute for an independent determination by Contractor of the amounts and types of insurance which Contractor shall determine to be reasonably necessary to protect itself and its Work.

## 19.    TERMINATION

19.1    **By Contractor**. Contractor may terminate this Agreement if Pulte commits a material breach of this Agreement and fails to cure such breach within 30 days of its receipt of written notice of the breach from Contractor.

19.2    **By Pulte**. Pulte may terminate this Agreement or any individual Work Order, with or without cause, effective upon notice to Contractor. A termination "for cause" includes circumstances where: (a) Contractor fails to comply with this Agreement; (b) Contractor indicates or makes any statements indicating that Contractor will not perform its obligations under this Agreement; (c) in the event of any proceedings by or against Contractor in bankruptcy, insolvency of Contractor, any proceedings for appointment of a receiver or trustee or an assignment for the benefit of creditors or any other similar event; (d) Contractor refuses or neglects to supply a sufficient quantity of Work of proper quality, as determined by Pulte; (e) Contractor fails to make prompt payment to Contractor's Agents or for Materials, equipment or labor; (f) Contractor violates any Applicable Law; or (g) Contractor is listed by the administrative office of an applicable employee benefit trust, including by way of illustration but not of exclusion, health, welfare, pension, vacation or apprenticeship trust, as being delinquent in the payment to any such trust, regardless of the construction project upon which delinquency occurred.

(a)     Pulte's total liability to Contractor upon termination of any Work Order without cause shall be limited to payment for completed Work, including any retainage, delivered and accepted by Pulte.

(b)     If Pulte terminates any Work Order for cause, Pulte may immediately provide any required labor and Work and Contractor shall reimburse and pay Pulte for all Costs. Pulte may deduct all such Costs from any money then due or thereafter to become due to Contractor under any Work Order.

19.3     **Post-Termination Obligations**. Upon expiration or termination of this Agreement for any reason, Contractor will, at Pulte's request, continue to provide Work pursuant to the terms of this Agreement, and provide reasonable transition assistance services to prevent disruption in Pulte's business activities, for a period of up to 3 months after the termination date. At Pulte's request, Contractor will promptly vacate the Project jobsite(s), remove all of its supplies, scaffolding, tools, facilities, appliances, fans and other equipment from the Project jobsite(s), complete all of Contractor's clean-up and other obligations, and otherwise reasonably cooperate with Pulte in winding down Contractor's participation on the applicable Project(s).

19.4     **Survival**. All provisions of this Agreement which by their nature should survive termination of this Agreement shall survive termination of this Agreement, including those provisions related to confidentiality, warranty, indemnification, insurance, waivers, releases and limitations of liability.

## 20.     CONFIDENTIALITY AND PUBLICITY

20.1     **Confidentiality**. During the term of this Agreement, Contractor may have access to information that is considered confidential and proprietary by Pulte. This information may include non-public information relating to prices, compensation, research, products, services, developments, inventions, processes, protocols, methods of operations, techniques, strategies, programs (both software and firmware), designs, systems, proposed business arrangements, results of testing, distribution, engineering, marketing, financial, merchandising or sales information, individual customer profiles, customer lists or aggregated customer data, and similar information of a sensitive nature (**"Confidential Information"**). Contractor may use Confidential Information only for the purposes of this Agreement and Work Orders. Contractor shall maintain the confidentiality of Confidential Information in the same manner in which it protects its own Confidential Information of like kind, but in no event shall Contractor take less than reasonable precautions to prevent the unauthorized disclosure or use of Confidential Information. Upon request, Contractor shall return all Confidential Information and shall not use Confidential Information for its own, or any third party's benefit. The provisions of this Section shall survive termination of this Agreement for so long as the Confidential Information is considered confidential by Pulte.

20.2     **Publicity**. Contractor shall not use any Pulte trademarks, service marks, trade names or logos or refer to Pulte directly or indirectly in any marketing materials, customer lists, media release, public announcement or other public disclosure relating to this Agreement or its subject matter without obtaining Pulte's prior written consent.

## 21.     GENERAL TERMS

21.1     **Time is of the Essence**. Time is of the essence in connection with all of Contractor's obligations under this Agreement.

21.2     **Force Majeure**. Subject to the terms of this Agreement, neither Party shall be liable for any failure or delay in performing its obligations hereunder during any period in which such performance is prevented or delayed by any Force Majeure Event.

21.3     **Independent Contractor Relationship**. The relationship between Pulte and Contractor is that of independent contractor. Nothing in this Agreement shall be construed as creating a relationship between Pulte and Contractor of joint venturers, joint employers, partners, employer-employee, or agent. Neither party has the authority to create any obligations for the other, or to bind the other to any representation or document. Pulte does not control the Work or Contractor's employees, and Contractor is solely responsible for management and all other employer functions with respect to its employees.

21.4     **Continued Performance**. Each party shall continue performing its obligations under this Agreement while any dispute submitted to litigation or any other dispute resolution process is being resolved until such obligations are terminated by the expiration or termination of this Agreement or by a final and binding award, order, or judgment to the contrary.

21.5     **Cooperation**. Where agreement, approval, acceptance, consent or similar action by either party is required by any provision of this Agreement, such action shall not be unreasonably delayed or withheld unless otherwise expressly permitted.

21.6   **Cumulative Rights**. All warranties provided by Contractor, and all of Pulte's rights and remedies set forth in this Agreement, are cumulative and are in addition to all other warranties, rights and remedies provided to Pulte by this Agreement, any other document, or at law, in equity or otherwise.

21.7   **Third Party Beneficiaries**. The parties agree that: (a) this Agreement is for the benefit of the parties to this Agreement and is not intended to confer any rights or benefits on any third party (including any employee of either party) other than the Indemnitees; and (b) there are no third-party beneficiaries to this Agreement, or any specific term of this Agreement, other than the Indemnitees.

21.8   **Entire Understanding of the Parties**. This Agreement contains the entire understanding of the parties with respect to the subject matter addressed herein and supersedes, replaces and merges all prior understandings, promises, representations and agreements, whether written or oral, relating thereto. Upon execution of this MTCA, and any renewal thereof, the terms of this MTCA shall apply to all then-outstanding Work Orders or other agreements between Pulte and Contractor. Both parties contributed to the drafting of this Agreement, and had the advice of counsel, and therefore agree that this Agreement should not be construed in favor of either party.

21.9   **No Modification Except in Writing**. Except as expressly provided herein, this Agreement may not be modified except by a writing signed by both parties.

21.10  **Construction of Terms**. As used in this Agreement, the word **"shall"** is always mandatory and not discretionary; the word **"may"** is permissive; the word **"includes"** means "includes without limitation" and the word **"including"** means "including without limitation" or "including but not limited to."

21.11  **No Waiver**. Any waiver of a party's right or remedy related to this Agreement must be in writing, signed by that party to be effective. No waiver shall be implied from a failure of either party to exercise a right or remedy. In addition, no waiver of a party's right or remedy shall effect the other provisions of this Agreement.

21.12  **Choice of Law and Forum Selection**. This Agreement shall be governed by the laws of the State in which the Work is performed and the federal laws of the United States. Except as otherwise provided in this Agreement, any litigation arising between the parties in relation to this Agreement shall be initiated and maintained in the state or federal courts in the State in which the Work is performed.

21.13  **Attorneys' Fees and Costs**. In any action, suit or arbitration proceeding arising out of or relating to this Agreement or any breach or alleged breach thereof, the losing party shall pay to the prevailing party all reasonable expenses incurred by the prevailing party, including, without limitation, costs, expenses and reasonable attorneys' fees. The prevailing party is the party who receives substantially the relief sought whether by judgment, summary judgment, dismissal, settlement or otherwise. In any suit, action, proceeding or arbitration primarily for the recovery of monetary damages, the award of reasonable attorneys' fees may not exceed the monetary damages awarded. This provision is intended to comply with N.C. Gen. Stat. § 6-21.6.

21.14  **Unenforceable Provisions**. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, such provision will be enforced to the fullest extent that it is valid and enforceable under Applicable Law. All other provisions of this Agreement will remain in full force and effect.

21.15  **Notice**. Any demand, request or notice which either party desires or may be required to make or deliver to the other shall be in writing and delivered by electronic mail transmission, personal delivery, reputable overnight courier, or registered or certified mail, return receipt requested, postage prepaid, addressed as set forth on page 1 or to such other address and person as either party may communicate to the other by written notice. Any notice or communication shall be deemed to have been given and received on the earliest of the following: (i) on the date of transmission, if delivered by electronic mail transmission on or before 5:00 p.m. on a business day, provided that written notice by one of the other approved methods of delivery is sent on the same day; (ii) on the next business day after transmission, if delivered by electronic mail transmission after 5:00 p.m. or on a Saturday, Sunday or state holiday, provided that written notice by one of the other approved methods of delivery is sent on the same day; (iii) on the date of delivery (or the first business day thereafter if delivered on a Saturday, Sunday or state holiday), if hand delivered or sent by overnight courier, with a written acknowledgement of receipt; or (iv) three (3) business days after the date of mailing, if sent by registered or certified mail,

Case 3:23-cv-00177-KDB-DCK   Document 1-2   Filed 03/24/23   Page 56 of 80

Docusign Envelope ID: 9111336B-2343-43ED-A3BC-FD542D6D9969

return receipt requested, postage prepaid. Notices given by legal counsel for any Party shall constitute notice from that Party. Notice by facsimile transmission is not an authorized form of notice under this Agreement.

21.16 **Assignment**. Neither party may assign this Agreement, in whole or in part, without the other party's prior written consent, which shall not be unreasonably withheld or delayed. Any attempted assignment without such written consent shall be void. Notwithstanding the foregoing, Pulte may assign this Agreement without Contractor's consent: (a) to one or more Affiliates, provided that each such Affiliate agrees to be bound by this Agreement; and (b) as reasonably necessary in connection with any merger, acquisition, sale of assets or other corporate restructuring. Subject to the provisions of this Section, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

## 22. WAIVER OF JURY TRIAL. FOR THEIR MUTUAL BENEFIT, PULTE AND CONTRACTOR WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT.

Exhibits to this Agreement consist of: *[Pulte Homebuilding Operations to identify additional Exhibits]*

Exhibit A: Scope of Work

Exhibit B: Job Site Rules

Exhibit C: Environmental Scope of Work

Exhibit D: Qualified Representative

Nc Master Trade Agreement

**AGREED AND ACCEPTED:**

**Pulte**                                      Installed Building Products,LLC dba B-Organized Insulati

                                               (Contractor's Full Legal Company Name)

By: _Joseph Randolph Kirby III_                By _Brian Hutto_
    1B256332AFC744F                               CAF905EDEB884DF
           (signature)                                  (signature)

Name: _Joe Kirby_                              Name_Brian Hutto_
         (printed)                                     (printed)

Title: _Procurement Manager_                   Title_General Manager_

Date: _11/11/2019_                             Date _11/4/2019_



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
01/21/2020

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: Cristian Toro | | |
|---|---|---|---|
| New Hope Insurance Agency<br>2664 S New Hope Rd<br>Gastonia, NC 28056 | PHONE (A/C, No, Ext): (704)824-3130 | | FAX (A/C, No): (704)943-0590 |
| | E-MAIL ADDRESS: cristiantoro@newhopeins.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : **Evanston Insurance Company** | | |
| INSURED<br><br>LS Framing Inc<br>7036 Scuppernong CT<br>Charlotte, NC 28215 | INSURER B : Progressive Southeastern Ins Co | | 38784 |
| | INSURER C : Hartford | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**EXHIBIT C**

## COVERAGES    CERTIFICATE NUMBER: 00002853-115094    REVISION NUMBER: 57

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY<br>  CLAIMS-MADE  X  OCCUR | Y | | 3AA357167 | 09/14/2019 | 09/14/2020 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 100,000 |
| | | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | X POLICY  PRO-JECT  LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | | Y | 03830933-3 | 07/03/2019 | 07/03/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | OWNED AUTOS ONLY  SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | HIRED AUTOS ONLY  NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | UMBRELLA LIAB  OCCUR | | | | | | EACH OCCURRENCE | $ |
| | EXCESS LIAB  CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | DED  RETENTION $ | | | | | | | $ |
| C | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y / N | | Y | 6S60UB-1K18696-4-20 | 02/07/2020 | 02/07/2021 | X PER STATUTE  OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>(Mandatory in NH) | Y | N/A | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
- PulteGroup, Inc. and its subsidiaries and affiliates is named as an additional insured for General Liability per the attached CG2010.
- Pultegroup, Inc. and its subsidiaries and affiliates in named as an additional insured for the auto liability.
- A Waiver of Subrogation in favor of PulteGroup, Inc. and its subsidiaries and affiliates applies to Workers Compensation
- General Liability policy is primary and non-contributory.
- No Residential construction exclusions are included within the General Liability policy.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| PulteGroup, Inc. and its subsidiaries and affiliates<br>Insurance Compliance<br>PO Box 100085- P1<br>Duluth, GA 30096 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*CRISTIAN TORO*  (CCT) |

© 1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)    The ACORD name and logo are registered marks of ACORD

Printed by CCT on January 21, 2020 at 01:58PM



# CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
09/23/2019

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Willis Towers Watson Southeast, Inc. fka Willis of Tennessee, Inc.<br>c/o 26 Century Blvd<br>P.O. Box 305191<br>Nashville, TN 372305191 USA | PHONE (A/C, No, Ext): 1-877-945-7378 | | FAX (A/C, No): 1-888-467-2378 |
| | E-MAIL ADDRESS: certificates@willis.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : Old Republic Insurance Company | | 24147 |
| INSURED<br>IBP Asset, LLC<br>dba B-Organized Insulation, LLC<br>6051-E Lakeview Road<br>Charlotte, NC 28269 | INSURER B : American Guarantee and Liability Insurance | | 26247 |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES CERTIFICATE NUMBER: W13017207 REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | | MWZY 314253 19 | 10/01/2019 | 10/01/2020 | EACH OCCURRENCE | $ 2,000,000 |
| | CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 1,000,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | Y | Y | | | | PERSONAL & ADV INJURY | $ 2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 4,000,000 |
| | POLICY X PRO-JECT X LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 4,000,000 |
| | OTHER: | | | | | | | $ |
| A | AUTOMOBILE LIABILITY | | | MWTB 314252 19 | 10/01/2019 | 10/01/2020 | COMBINED SINGLE LIMIT (Ea accident) | $ 5,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | X OWNED AUTOS ONLY SCHEDULED AUTOS | Y | Y | | | | BODILY INJURY (Per accident) | $ |
| | X HIRED AUTOS ONLY X NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| B | X UMBRELLA LIAB X OCCUR | | | AUC 9314206-08 | 10/01/2019 | 10/01/2020 | EACH OCCURRENCE | $ 10,000,000 |
| | EXCESS LIAB CLAIMS-MADE | Y | Y | | | | AGGREGATE | $ 10,000,000 |
| | DED X RETENTION $ 0 | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY Y / N | | | MWC 314250 19 | 10/01/2019 | 10/01/2020 | X PER STATUTE OTH- ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | No N/A | Y | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Re: Any and all jobs performed by the Named Insured.

Reference No. 461BOR101

Re: Premises/ongoing operations and products completed operations to benefit Pulte Homes.

**EXHIBIT D**

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Pulte Homes, Inc. and its subsidiaries and affiliates<br>Insurance Compliance<br>P.O. Box 12010 - P1<br>Hemet, CA 92546-8010 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.<br><br>AUTHORIZED REPRESENTATIVE<br>*Kevin Glasgow* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03) The ACORD name and logo are registered marks of ACORD



# ADDITIONAL REMARKS SCHEDULE

| AGENCY | NAMED INSURED |
|---|---|
| Willis Towers Watson Southeast, Inc. fka Willis of Tennessee, Inc. | IBP Asset, LLC<br>dba B-Organized Insulation, LLC |
| **POLICY NUMBER**<br>See Page 1 | 6051-E Lakeview Road<br>Charlotte, NC 28269 |

| CARRIER | | NAIC CODE | |
|---|---|---|---|
| See Page 1 | | See Page 1 | EFFECTIVE DATE: See Page 1 |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ___25___   FORM TITLE: Certificate of Liability Insurance

General Liability coverage includes Contractual Liability coverage.

Pulte Homes, Inc. and its subsidiaries and affiliates are named as Additional Insureds as respects to General Liability and Automobile Liability policies only as required by written contract.

Type of work performed: waterproofing and insulation.

General Liability coverage includes Contractual Liability coverage.

General Liability policy does not contain a residential exclusion.

Coverage applies in state where work is being performed.

As respects Workers Compensation, the Waiver of Subrogation applies to Any Person or Organization that requires you to waive your rights of recovery in a written contract or agreement with the named insured that is executed prior to the accident or loss as permitted by law.

ACORD 101 (2008/01)

© 2008 ACORD CORPORATION. All rights reserved.

The ACORD name and logo are registered marks of ACORD



**MARKEL**

<div style="text-align:center; border:3px solid black;">

**EXHIBIT**

**E**

</div>

March 29, 2022

**VIA EMAIL ONLY**

Christi E. Justice
Christine_Justice@gbtpa.com
Construction Defect Senior Resolution Specialist
PO Box 2934
Clinton, IA 52733

## ADDITIONAL INSURED COVERAGE DISCLAIMER

|  |  |
|---|---|
| Our Insured: | LS Framing, Inc. |
| Your Client: | Pulte Group, Inc. |
| Claimant: | Nathan Tesh |
| Issuing Company: | Evanston Insurance Company |
| Policy No.: | 3AA357167 (09/14/2019-09/14/2020) |
| Date of Loss: | October 29, 2019 |
| Our File No.: | C070485 |

Ms. Justice,

Markel Service Incorporated, as claim service manager for Evanston Insurance Company ("Evanston") acknowledges receipt of your additional insured tender on behalf of Pulte Group, Inc. ("Pulte") regarding a lawsuit titled, Nathan Tesh v. Pulte Home Company, LLC, et al. in the State of North Carolina, Mecklenburg County, Case Number: 21-CVS-11962. Please be advised I am the adjuster assigned to this matter, and all future correspondence should be directed to my attention.

Based upon review of the policy, the Complaint and the investigation to date, Evanston concludes it has no current obligation to defend or indemnify Pulte in this matter. A detailed explanation for Evanston's disclaimer is set forth below.

### FACTUAL BACKGROUND

On October 23, 2019, LS Framing, Inc. ("LS Framing") entered into a Master Trade Contractor Agreement with Pulte. LS Framing agreed to name Pulte, its subsidiaries and affiliates as an additional insured on a primary an non-contributory basis under Section 18. Paragraph e. of this agreement. Plaintiff filed his Complaint on August 24, 2021 against Pulte, J Framing LLC ("J Framing") and LS Framing. Pursuant to the Complaint, Plaintiff was employed by B-Organized Insulation, LLC ("BOI"), while performing work at the Central Point townhome development, located at the corner of East 10th street and Seigle Ave., located in Charlotte, North Carolina on October 29, 2019. Plaintiff alleges while in the scope and course of his

**Markel - Claims**
**Arizona · California · Illinois · Nebraska · New Jersey · New York · Texas · Virginia · Wisconsin**
P.O. Box 2009, Glen Allen, VA 23058-2009  (800) 362-7535  Fax (855) 662-7535  markelclaims@markel.com
California License: Markel West Insurance Services #0D95581
www.markel.com

Please review our privacy policy at www.markel.com/privacy-policy.

employment, he stepped backwards into an elevated stairwell opening and fell ten-twelve feet on the concrete surface below, sustaining catastrophic and permanent injuries. Plaintiff attributes his injuries to defendants failure to install a proper guardrail around the stairwell opening. Medical bills to date are in excess of $200,000.

## EVANSTON INSURANCE COMPANY'S POLICY INFORMATION

Evanston insures LS Framing Inc. under a Commercial General Liability Insurance Policy, designated as policy number 3AA357167. This policy provides coverage for the period September 14, 2019 through September 14, 2020. The policy is subject to the following Limits of Liability:

| | | |
|---|---|---|
| (i) | $2,000,000 | General Aggregate Limit (Other than Products/Completed Operations); |
| (ii) | $2,000,000 | Products/Completed Operations Aggregate Limit; |
| (iii) | $1,000,000 | Personal and Advertising Injury Limit (Any One Person or Organization); |
| (iv) | $1,000,000 | Each Occurrence Limit; |
| (v) | $100,000 | Damage to Rented Premises (Any One Premises); |
| (vi) | $5,000 | Medical Expense (Any One Person). |

## AN EXPLANATION OF EVANSTON'S DISCLAIMER

Based upon a review of the policy, the Complaint, and the investigation to date, Evanston concludes that is has no current duty to defend or indemnify Pulte. Although Evanston is relying upon its policy in its entirety in informing you of this lack of coverage, Evanston refers you to the following specific policy provisions.

The Evanston policy includes multiple Insuring Agreements. For the purpose of this claim, we refer you to the following:

*SECTION I – COVERAGES*
*COVERAGE A BODILY INJURY AND PROPERTY*
*DAMAGE LIABILITY*
*1. Insuring Agreement*

    *a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:*

        *(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and*

        *(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.*

    *No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.*

*b. This insurance applies to "bodily injury" or "property damage" only if:*

  *(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";*

  *(2) The "bodily injury" or "property damage" occurs during the policy period; and*

  \*\*\*

"Bodily injury" is defined in the policy as follows:

*"Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.*

"Occurrence" is defined in the policy as follows:

*"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.*

\*\*\*

The policy contains multiple additional insured endorsements. For the purpose of this claim, we refer you to the following:

*ADDITIONAL INSURED-OWNERS, LESSEES OR CONTRACTORS-COMPLETED OPERATIONS*

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE PART*
*PRODUCTS COMPLETED OPERATIONS LIABILITY COVERAGE PART*

*SCHEDULE*

| Name of Additional Insured Person(s) or Organization(s) | Location And Description of Covered Operations |
|---|---|
| Pulte Group Inc and its Subsidiaries And affiliates insurance compliance, PO BOX 100085-P1, Duluth, GA 30096 | 7036 Scuppernong Court, Charlotte, NC 28215 |

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.*

  *A. Section II- Who is an Insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by:*

  *1. Your acts or omissions; or*

  *2. The acts or omissions of those acting on your behalf;*

*in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.*

However:

    *1. The insurance afforded to such additional insured only applies to the extent permitted by law; and*

    *2. If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.*

    *B. With respect to the insurance afforded to these additional insured, the following additional exclusions apply:*

    *This insurance does not apply to "bodily injury" or "property damage" occurring after:*

    *1. All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or*

    *2. That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged on performing operations for a principal as part of the same project.*

    *C. With respect to the insurance afforded to these additional insureds, the following is added to Section III- Limits of Insurance:*

*If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:*

    *1. Required by the contract or agreement; or*

    *2. Available under the applicable Limits of Insurance shown in the Declarations;*

*whichever is less.*

*This endorsement shall not increase the applicable limits of Insurance shown in the Declarations.*

Pursuant to the above additional insured endorsement, Pulte qualifies as an additional insured for LS Framing's work performed at 7036 Scuppernong Court, in Charlotte, NC 28215. 7036 Scuppernong Court, is a single family home, and not within the Central Point Townhome development where Plaintiff alleges his injury took place. As such, the additional insured endorsement extending coverage to Pulte referenced above does not apply to loss.

The Evanston Policy also includes the following Blanket Additional Insured Endorsement:

*BLANKET ADDITIONAL INSURED*

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM*
*LIQUOR LIABILITY COVERAGE FORM*
*OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM*
*PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM*

*SCHEDULE*

*Please refer to each Coverage Form to determine which terms are defined. Words shown in quotations on this endorsement may or may bot be defined in all Coverage Forms.*

*A. Who is an Insured is amend to include as an additional insured any person or entity to whom you are required by valid written contract or agreement to provide such coverage, but only with respect to "bodily injury", "property damage" (including "bodily injury" and "property damage" included in the "products-completed operations hazard"), and "personal and advertising injury" caused, in whole or in part, by the negligent acts or omissions of the Named Insured and only with respect to any coverage not otherwise excluded in the policy.*

*However:*

*1. The insurance afforded to such additional insured only applies to the extent permitted by law; and*

*2. The insurance afforded to such additional insured will not be broader than that which you are required by the valid written contract or agreement to provide for such additional insured.*

*Our agreement to accept an additional insured provision in a valid written contract or agreement is not an acceptance of any other provisions of such contract or agreement or the contract or agreement in total.*

*When coverage does not apply for the Named Insured, no coverage or defense will apply for the additional insured.*

*No coverage applies to such additional insured for injury or damage of any type to and "employee" of the Named Insured or to any obligation of the additional insured to indemnify another because of damages arising out of such injury or damage.*

*B. With respect to the insurance afforded to these additional insured, the following is added to limits of insurance:*

*1. Required by the valid written contract or agreement; or*

*2. Available under the applicable limits of insurance shown in the Declarations; whichever is less*

*This endorsement shall not increase the applicable limits of insurance shown in the Declarations.*

*All other terms remain unchanged.*

The master subcontract agreement between LS Framing and Pulte provided meets the criteria listed in the Blanket Additional Insured Endorsement, therefore Pulte qualifies as an additional insured with respect to "bodily injury" caused in whole or in part by LS Framing's negligent acts or omissions. At this time we are unable to determine if LS Framing caused or contributed to the alleged injuries sustained by Plaintiff. However, even if Plaintiff's injuries were caused in whole or in part by LS Framing, there would be no coverage as more fully described below.

The policy includes the following exclusion precluding coverage for "bodily injury" to contractors or subcontractors that precludes coverage to Pulte for this claim:

*EXCLUSION-EMPLOYER'S LIABILITY AND BODILY INJURY TO CONTRACTORS OR SUBCONTRACTORS*

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE FORM*

## OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM

A. The Employer's Liability Exclusion under Bodily Injury and Property Damage Liability is replaced by the following:

This insurance does not apply to:

Employer's Liability

"Bodily injury" to:

(1) An "employee", "volunteer worker" to "temporary worker" of the insured arising out of an in the course of:

   (a) Employment by the insured; or

   (b) Performing duties related to the conduct of the insured's business;

(2) Any other person who performs labor in any capacity for or on behalf of any insured, with or without any form of compensation; or

(3) The spouse, partner, child, parent, brother, sister or any other relative of any person described in Paragraph (1) or (2) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion applies to any liability assumed under an "insured contract".

B. The following exclusion is added to Bodily Injury And Property Damage Liability:

This insurance does not apply to:

Bodily Injury to Contractors or Subcontractors

"Bodily injury" to any:

(1) Contractor or subcontractor while working on behalf of any insured;

(2) Employee, volunteer worker, leased worker or temporary worker of such contractor or subcontractor indicated in Paragraph (1) above;

(3) Additional subcontractor, including the employees, volunteer workers, leased workers or temporary workers of such contractor or subcontractor indicated in Paragraph (1) above; or

(4) Any other person who performs labor in any capacity for or on behalf of any person indicated in Paragraph (1), (2) or (3) above, with or without any form of compensation.

This exclusion applies:

   (a) Even if the claim against any insured alleges negligence or other wrong doing in the:

      (i)    Selection, hiring or contracting;

      (ii)   Investigation;

      (iii)  Supervision or monitoring;

      (iv)  Training; or

      (v)   Retention

          of any contractor or subcontractor for whom any insured is or was legally responsible and whose acts or omissions would be excluded by Paragraph (1), (2), (3) or (4) above.

   (b) Whether the insured may be liable as an employer or in any other capacity;

   (c) To any obligation to share damages with or repay someone who must pay damages because of the injury; and

   (d) To liability assumed by the insured under an "insured contract".

   All other terms and conditions remain unchanged.

Pursuant to the Complaint, Plaintiff was employed by BOI performing work at the Central Point Townhome development on the date the alleged injury took place, October 29, 2019. BOI contracted directly with Pulte to provide insulation services at the Central Point townhome development. The above referenced exclusion precluding coverage for "bodily injury" to contractors or subcontractors precludes coverage for Pulte for this claim, as the Plaintiff was allegedly injured in the course and scope of his employment with BOI, a subcontractor of Pulte. Therefore, Evanston will not defend or indemnify Pulte in this matter.

There are other provisions that may preclude coverage for this claim. The Evanston Policy includes the following New Residential Work Limitation Exclusion Endorsement:

*NEW RESIDENTIAL WORK LIMITATION*
*This endorsement modifies insurance provided under the following:*
*COMMERCIAL GENERAL LIABILITY COVERAGE FORM*

*A. The following is added to Paragraph 2. Exclusions of Section 1- Coverages, Coverage A- Bodily Injury and Property Damage Liability and Coverage B- Personal And Advertising Injury Liability:*
*This insurance does not apply to:*
*New Multi-Unit Residential Development Work*

*"Bodily injury", "property damage" or "personal and advertising injury", including losses within the "products completed operations hazard" arising out of "your product" or "your work" related to any newly constructed residential:*

*(1) Multi-family housing development in which each unit it individually titled, including but not limited to a duplex, condominium or townhouse development;*
*(2) "Housing cooperative development";*
*(3) "Tract home development";*
*(4) Planned unit development;*
*(5) Timeshare development.*

*However this exclusion does not apply to*
*(a) "your product" or "your work" related to any newly constructed "apartment structure" or*
*(b) Your projects consisting of 20 or fewer units in any one development, regardless of the size of the development.*
*B. With respect to this endorsement only, the following definitions are added to the Definitions section:*

*"Apartment structure" means a multi-family structure of units that are held for rental in which all units are owned by the same person or organization and not individually titled. "Apartment structure" includes the building and the individual units.*

*"Tract home development" means a grouping of more than 20 single-family dwellings which:*
*a. Are constructed in the same parcel, adjacent parcels or other parcels located within on geographic area that are considered to be a single project; and*

b. *Share common or similar design elements, floor plans, blue prints or architectural details.*

The policy defines "your work" as:

22. *"Your work"*
   a. *Means:*
   *(1) Work or operations performed by you or on your behalf; and*
   *(2) Materials, parts or equipment furnished in connection with such work or operations.*
   b. *Includes:*
   *(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use or "your work"; and*
   *(2) The providing of or failure to provide warnings or instructions.*

Plaintiff alleges the injury took place while performing work at the Central Point Townhome development, which consists of 126 new townhome units. Pulte was the homebuilder for these townhomes, and LS Framing was a framing subcontractor hired by Pulte. In addition we understand LS Framing subcontracted to J Framing for work performed at the Central Point Home development. At this time, we are unaware of the number of homes in this development which include LS Framing and/or J Framing's work. Evanston reserves the right to deny coverage based on the above New Residential Exclusion, if LS Framing and/or J Framing, performed work on more than 20 units in the Central Point Townhome development.

## CONCLUSION

Based on all of the foregoing, Evanston disclaims coverage for this loss and will not be handling this claim on Pulte's behalf. We recommend tendering this claim to any additional insurer who may on risk for this loss.

Please be advised that our position is based upon the facts and information available to Evanston at this time and is subject to the availability and review of additional information. Evanston may revise our position and raise any other coverage issues or coverage defenses without prejudice, waiver or estoppel. Furthermore, this letter does not constitute a waiver of any policy provisions or defenses available to the Evanston. All rights are expressly reserved.

This letter quotes the policy in part. However, please refer back to the policy for the complete and precise language of the policy. The language cited herein is not meant to change, supplement, add or subtract from the policy terms. The language in the policy itself is controlling.

If any of the factual information relied upon in this letter is materially incorrect, or if you possess any additional information which you believe impacts the coverage position taken herein, please immediately contact the undersigned at 702-294-7250.

In the event that you receive an amended pleading, please forward that information to our attention so that the amended allegations can be evaluated for coverage under the policy.

Please reference our File Number C070485 on all future correspondence.

Very Truly Yours,

*Jessica Labrague*

Jessica Labrague
Senior Claims Examiner
Jessica.Labrague@markel.com
702-294-7250
MARKEL SERVICE, INCORPORATED

CC:

Cristian Toro
Cristiantoro@newhopeins.com

LS Framing, Inc.
(lsframing@outlook.com)
(fmadrigal86@gmail.com)
PO Box 43207
Charlotte, NC 28215



**Helmsman**
Management Services LLC™

Megan E. Schaeffer
P.O.Box 7214
London, KY 40742
Phone: 717-303-2333
Fax: 888-325-8127
Megan.Schaeffer@helmsmantpa.com

## CERTIFIED LETTER/ RETURN RECEIPT REQUESTED

December 9, 2021

Gallagher Bassett Services, Inc.
Christi E. Justice
PO Box 2934
Clinton, IA 52733-2934

| | |
|---|---|
| **Our Client:** | IBP Asset, LLC/B-Organized Insulation |
| **Your Client:** | PulteGroup, Inc. |
| **Our Claim No:** | P 949-367269 |
| **Your Claim No:** | 000907-014344-GB-01 |
| **Claimant:** | Nathan Tesh |
| **Date of Loss:** | 10/29/2019 |

Dear Ms. Justice,

I received a copy of your tender of indemnity, defense and demand for additional insured status under the contract between Pulte and IPB Asset, LLC/B-Organized Insulation.

You make this demand as an overaction of an underlying lawsuit filed by Nathan Tesh, an employee of IBP Asset, LLC/B-Organized Insulation against PulteGroup, Inc. Upon review, it is our position that North Carolina statutes are clear that Workers Compensation is the sole remedy for injuries occurring to employees such as Nathan Tesh.

In this specific case, the allegations of the Complaint confirm that Mr. Tesh was injured during the course and scope of his employment with IBP Asset, LLC/ B-Organized Insulation. As such, and with our position on Workers Compensation being the sole remedy for Mr. Tesh, we are not in a position to accept your tender.

Should there be any legal analysis to support your tender, please provide the same for our review.

Thank you,

Megan Schaeffer
Sr. Technical Specialist I
East Region Complex
Liberty Mutual Insurance/Helmsman Management Services



# Helmsman
Management Services LLC.™

Megan E. Schaeffer
P.O.Box 7214
London, KY 40742
Phone: 717-303-2333
Fax: 888-325-8127
Megan.Schaeffer@helmsmantpa.com

Email: Megan.Schaeffer@Helmsmantpa.com
Phone: 717-303-2333

CC:
IBP Asset LLC
Matt Piwonka
Email Only: Matt.Piwonka@installed.net

NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
COUNTY OF MECKLENBURG               SUPERIOR COURT DIVISION
                                       FILE NO. 23 CVS 2330

PULTE HOME COMPANY, LLC,

     Plaintiff,

v.

LS FRAMING, INC., IBP ASSET,                **FIRST SET OF REQUESTS**
LLC d/b/a B-Organized Insurance, LLC,          **FOR PRODUCTION**
EVANSTON INSURANCE
COMPANY, and OLD REPUBLIC
INSURANCE COMPANY,

     Defendants.

     **COMES NOW** Plaintiff Pulte Home Company, LLC ("PULTE") by and through the

undersigned counsel, requests that the Defendant Evanston Insurance Company (hereinafter,

"EVANSTON") produce the following documents and things in your possession, custody or

control in accordance with Rules 26 and 34 of the North Carolina Rules of Civil Procedure for

inspection and copy at the offices of BOYLE, LEONARD, & ANDERSON, P.A., Attorneys

for the Defendants/Counterclaim Plaintiffs, located at 9111 W. College Pointe Dr., Fort Myers, FL

33913, within 30 days of the date of service of this request, or within 45 days of the date of service

of the summons and complaint in this action, whichever is later. In lieu of production of documents

for copying, EVANSTON may attach hereto exact copies (hard copies or electronic) of all

requested documents, clearly designating each request to which each document pertains, and mail or deliver them to Thomas E. Shepard, Attorney for Plaintiff, at the address listed above.

## INSTRUCTIONS

1. In responding to these requests, you shall set forth the request in full before each response. Separate responses shall be provided with respect to each request and its subdivisions. With respect to each document produced, identify the person producing the document and the number of the request to which it is responsive.

2. If you believe that any of the following discovery requests call for information or documents subject to a claim or privilege, answer or produce as much as is not objected to, state that part of each discovery request to which you raise objection, and set forth the basis for your claim of privilege with respect to the materials/information that you refuse to produce, including a statement identifying the nature of the materials/information withheld, and for each document as to which you claim privilege state: (i) the date and subject matter of each document; (ii) the name(s) of the person(s) who prepared the document; and (iii) the name(s) of the person(s) for whom the document was intended.

3. Should a request call for the production of a document or documents claimed to be privileged, identify the document, identify the author(s) and recipient(s) of the document, identify the date of the document's creation, describe the document, state the privilege claimed, and the basis for the assertion of the privilege.

4. If any of the documents cannot be produced in their entirety: (i) produce to the extent possible; (ii) note the deficiency in your written response; (iii) specify the reason for the

2

deficiency; (iv) provide a summary of the documents not produced; and (v) identify all persons with knowledge of the deficiency.

5.      The documents and/or materials being requested are believed to be in the possession, custody, and/or control of the party to whom this request is directed. The information sought by this request is relevant to the subject of this action and cannot otherwise be obtained without undue hardship, if at all. In the event that all or part of the document(s) and/or materials requested herein are not in the possession, custody, and/or control of the party to whom this request is directed, then the undersigned counsel requests the identity and location of all persons having such possession, custody, and/or control, if known.

6.      For any document requested which was at one time in existence but is no longer in existence, please state for each such document: (a) the type of document; (b) the date upon which it ceased to exist; (c) the circumstances under which it ceased to exist; (d) the identity of all persons having knowledge of the circumstances under which it ceased to exist; and (e) the identity of all persons having knowledge of the contents.

7.      This request is made in good faith and for the purposes expressed.

8.      **Pursuant to North Carolina Rule of Civil Procedure 26(e), these requests are continuing and require additional answers as further information is obtained between the time the answers are served and the time of trial. Such additional answers shall be served from time to time, but not later than 30 days after such additional information is received.**

## DEFINITIONS

1.      As used herein, the words "document" and "documents" include the original and any copies of any written, printed, typed, or graphic matter of any kind or nature, regardless of how

3

produced or reproduced, including, but not limited to, any book, pamphlet, periodical, letter, memorandum, contract, agreement, invoice, bill, receipt, cancelled check, telegram, report, record, study, handwritten note, working paper, paper, chart, graph, drawing sketch, index, tape, data sheet, data processing card, personal notes, personal diaries, personal calendars, financial statement, tickets, expense records, vouchers, working papers, and drafts of any kind, that is now or was at any time in the possession, custody, or control of EVANSTON, or in the possession, custody, or control of EVANSTON's present or former agents, representatives, or employees, or any and all persons and/or entities acting on EVANSTON's behalf. The above shall include any documents of any other form of writing or record of any kind; made at any time; in the possession, custody, or control of such individuals or entities, or known by EVANSTON to exist or have existed.

2.     As used herein, the words "document" and "documents" include electronic data, specifically including, but not limited to, any form of writing or data storage in or on hard drives, floppy discs, taped backups, compact discs, DVDs, email storage facilities, cloud storage facilities (i.e., Google Drive, Amazon Web Services, Microsoft OneDrive, Apple iCloud), audio tapes, videotapes, laser disks, zip drives, smartphones, mobile phones, or other portable digital media; internet or intranet servers, internet service providers; cloud storage or any other online storage or data/document/file backup.

3.     The term "electronic data, documents, information," or "ESI" shall mean and refer to any and all electronic data or information stored on a computing or storage device. Information and data is considered "electronic" if it exists in a medium that can only be read through the use of a computer device. This term includes, but is not limited to, databases; all text

4

file and word processing documents (including metadata); presentation documents; spreadsheets; graphics, animations and images (including, but not limited to, .JPG, .GIF, .BMP, .PDF, .TIFF files); email; email strings; instant messages (including attachments, logs of email history and usage; header information and "deleted" files); email attachments; calendar and scheduling information; cache memory; Internet history files and preferences; audio, video and audiovisual recordings; voicemail stored on databases; networks; computers and computer systems activity logs; servers; archives; backup or disaster recovery systems; hard drives, flash drives, discs, CDs, diskettes, removable drives, tapes, cartridges and other storage media; printers; scanners; personal digital assistants; computer calendars; handheld wireless devices; cellular telephones; pagers; fax machines; and voicemail systems. This term further includes, but is not limited to, on-screen information, system data, archival data, legacy data, and residual files. Technical terms related to e-discovery are intended to be defined as in The Sedona Conference Glossary for E-discovery and Digital Information Management, Feb. 2020 (Fifth Edition) and subsequent versions, except to the extent application of the definitions would render the discovery requests herein to be beyond the scope of discovery under the applicable North Carolina Rules of Civil Procedure.

*See* https://thesedonaconference.org/publication/The_Sedona_Conference_Glossary.

4.     As used here, the words "identify," "identity" or "identification," when used in reference to a natural person, include a request for his or her full name and present or last known address, his or her present or last known position and business affiliation, and each of his or her positions during the relevant time period requested; when used in reference to a document kept or prepared, include a request for its author, type of document (e.g., letter, memorandum, telegram, chart, photograph, salary production, etc.) — or if the above information is not available, some

5

other means of identifying it — and its present location and name of each of its present custodians; when used in reference to an entity or business organization of any sort, the words include a request for said entity's principal place of business address, state of incorporation, and nature of business. If any document requested herein was, but no longer is in your possession, subject to your custody or control, or in existence, state whether it: (a) is missing or lost, (b) has been destroyed, (c) has been transferred voluntarily or involuntarily to others, or (d) otherwise has been disposed of. In each instance above, explain the basis for and circumstances surrounding your contention that the document is missing or lost, or has been destroyed or transferred. Identify any authorization for the disposition, destruction or transfer of the document and the person who authorized such. State the approximate date of the authorization, loss, destruction or transfer of any document.

5.     As used herein, the words "person" or "persons" include natural persons, firms, partnerships, associations, joint ventures, corporations, and other entities.

6.     As used herein, the words "communication" or "correspondence" include all letters, telegrams, notices, messages, inter-office or intra-office memoranda, inter-agency or intra-agency memoranda, electronic mail or other written communications, notes, memoranda or other records or retrievable preservation of conversations, meetings, conferences or other oral communications.

7.     As used herein, "business" shall include any business association including, but not limited to: a sole proprietorship, joint stock company, partnership, limited liability company, corporation, real estate investment trust, or any other organization or entity.

6

8.     The term "date of this response" means information or documentation known or in your possession, custody or control as of the date of your response to these discovery requests, as well as of the date of any supplementation thereto.

9.     The terms "EVANSTON," "YOU," and "YOUR" each mean and refer to Plaintiff, EVANSTON INSURANCE COMPANY, its employees, agents, adjusters, directors, officers, subsidiaries, parent entities, holding companies, joint ventures, and other related entities, as well as any/all persons and/or entities acting or purporting to act on behalf of EVANSTON.

10.     The term "PULTE" means and refers to Plaintiff PULTE HOME COMPANY, LLC and includes the employees, agents, directors, officers, subsidiaries, parent entities, holding companies, joint ventures, and other related entities, as well as any/all persons and/or entities acting or purporting to act on behalf of PULTE.

11.     The term "Underlying Action" shall refer to the case captioned: *Nathan Tesh v. Pulte Home Company, LLC et al.*, 21-CVS-11962.

12.     The term "LS FRAMING" means and refers to LS FRAMING, INC. and includes the employees, agents, directors, officers, subsidiaries, parent entities, holding companies, joint ventures, and other related entities, as well as any/all persons and/or entities acting or purporting to act on behalf of LS FRAMING, INC.

## DOCUMENTS TO BE PRODUCED

1. Copies of any and all policies of insurance issued by EVANSTON to LS FRAMING from 2019 to the present.

2. EVANSTON's underwriting file(s) concerning LS FRAMING and any policies issued by EVANSTON to LS FRAMING from 2019 to the present, including, but not limited to, policy number 3357167 issued to LS FRAMING for the policy year September 14, 2019 to September 14, 2020.

7

3. Any and all tenders, requests for coverage, letters, correspondence and/or other documentation issued by LS FRAMING to EVANSTON with respect to the Underlying Action and the loss, damages, facts and circumstances that are the subject of the same.

4. Any and all reservation of rights letters, denials, correspondence and/or other documentation issued by EVANSTON to LS FRAMING with respect to the Underlying Action and the loss, damages, facts and circumstances that are the subject of the same.

5. Any and all additional insured tenders, requests for coverage, letters, correspondence and/or other documentation issued by PULTE to EVANSTON with respect to the Underlying Action and the loss, damages, facts and circumstances that are the subject of the same.

6. Any and all reservation of rights letters, denials, correspondence and/or other documentation issued by EVANSTON to PULTE with respect to the Underlying Action and the loss, damages, facts and circumstances that are the subject of the same.

7. All documents on which YOU rely to support YOUR denial of coverage to PULTE as an additional insured with respect to the Underlying Action and the loss, damages, facts and circumstances that are the subject of the same.

8. All documents on which YOU rely to support YOUR denial of coverage to LS FRAMING with respect to the Underlying Action and the loss, damages, facts and circumstances that are the subject of the same.

9. Any and all documents, communications, and/or ESI that YOU intend to utilize at the ultimate trial of this matter.

BOYLE, LEONARD, & ANDERSON, P.A.

Thomas E. Shepard
N.C. State Bar No. 51204
9111 West College Pointe Drive
Fort Myers, FL 33919
Telephone: (239) 337-1303
Facsimile: (239) 337-7674
E-mail: tshepard@insurance-counsel.com
E-mail: eservice@insurance-counsel.com
*Attorneys for Plaintiff*

Dated: Feb. 14, 2023

8